**LEMAR TOWING CO., INC.**

v.

**FIREMAN'S FUND INSURANCE COMPANY.**

**Civ. A. No. 70–1054.**

United States District Court,
E. D. Louisiana.

July 17, 1972.

Joaquin Campoy, William S. Stone, Campoy, Hurley & Senter, New Orleans, La., for plaintiff.

Francis Emmett, Bruce W. Dinwiddie, International Trade Mart, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendant.

BOYLE, District Judge:

The Tug TRUDY B[1] left the Industrial Canal in the Port of New Orleans on October 14, 1969, at about 11:00 p. m., bound, via the Intracoastal Waterway and waters known as the Rigolets, for a destination on the West Pearl River some 80 miles north of its mouth, all of said waterways being Louisiana waters.

At all times pertinent the TRUDY B was manned by a captain, a mate and a deckhand. The two light shell barges she was to deliver to a Jahncke loading dock were made up for pushing until she reached the Rigolets when they were placed in tow astern because of the shallow waters of that body. When she reached the mouth of the West Pearl the barges were again positioned for pushing and so remained until reaching their destination.

The voyage was not uneventful. On the night of October 15, 1969, when in negotiating a bend in the West Pearl, not far above lock #2, the tug struck and scraped her port side against the river bottom, bank or some other unknown submerged object. Fearful that some damage may have been caused by the grounding, the captain backed the TRUDY B down to lock #2, tied off the barges, and put the tug on the bank for the night.

The next morning, at approximately 6:00 a. m., it was discovered that there was at least a foot of water above the engine room deck plates. Captain Bearb then sent the mate to telephone the Jahncke facility to request a pump since the vessel's electric pump, which had been underwater during the night, was feared inoperative. Using both the Jahncke pump and the vessel's engine pump, the captain was able to pump out the vessel to the point where he could see that water was entering through the loosened stuffing boxes and a small crack[2] which he discovered in the vessel's port chine. The stuffing boxes were tightened to a mere drip and the tug continued upriver to the Jahncke location where Captain Bearb again inspected the vessel.

Captain Bearb then contacted Marcus Smith, then secretary-treasurer and now the president of Lemar Towing Co., Inc., (hereafter Lemar) and reported the condition of the tug. Smith instructed the captain to change the oil in the clutches, plug the leak by placing rags in the crack, and return the tug to a shipyard on the Harvey Canal in Harvey, Louisiana. These tasks were accomplished and the tug was once again underway.

During the return voyage down the West Pearl the vessel's electric pump had dried and was used only intermittently to prevent its overheating. The engine pump remained operative and the entry of water was apparently controlled.

Nearing the mouth of the West Pearl, at approximately 11:00 p. m., the TRU-

---

1. The tug TRUDY B (ex—MANDY LEE), official number 270811, was built in 1955; she was of 38 gross and 26 net tons, 48′ 3″ long, 16′ 6″ in beam, and 6′ 6″ in draft; she had twin screws powered by two V8–71 GM diesel engines, developing a total of approximately 600 horsepower.

2. Captain Bearb described the crack as being about 8″ in length and about ¼ of an inch wide. Marine Surveyor Fred Perrin, who examined the vessel, testified that the total crack was 8″ but that only 3 or 4 inches of the crack were open and then only about ¹⁄₃₂ of an inch wide.

DY B momentarily paused at the Highway 90 bridge to take on fresh water and to check the water level in the engine room which was then below the floor plates. Leaving the West Pearl the TRUDY B next stopped at the railroad bridge which crosses the Rigolets where she tied up. When the fog patches, which were encountered about the railroad bridge, appeared to be lifting the vessel then headed for Catfish Point around which lay the Intracoastal Waterway and the route home. Between the Highway 90 bridge and the railroad bridge both pumps were continuously used to control the water level in the engine room.

The captain testified that after running for approximately twenty-five minutes in the direction of Catfish Point the TRUDY B encountered dense fog and attempted to return to the railroad bridge. However, the vessel did not find the return course and after the estimated running time had elapsed without locating the bridge the captain realized that he was lost. The vessel, having no anchor, kept running in search of a place to tie off. When the fog finally lifted, it was 4:00 a. m. on the morning of the 17th and, as was later discovered, the vessel was off the coast of Mississippi near the Gulfport-Biloxi area.

At 6:00 a. m. the vessel came upon an oyster boat whose crew gave her directions to the Gulfport Ship Channel which led into the Intracoastal. Pursuing the given course, the TRUDY B, now with water above her floor plates in the engine room, found the channel and the buoy markers as described by the oyster boatmen. As she passed Ship Island about 7:00 a. m., she encountered heavy seas and, already having taken a slight list to port, on one heavy roll to port she was unable to recover, continued to roll over, and then sank in the vicinity of the intersection of the Intracoastal and the Gulfport Ship Channel near buoy #25. The crew was taken

from the sinking vessel by a passing yacht.

Notice of the sinking and tender of abandonment of the vessel to defendant underwriter was immediately given by plaintiff. Defendant rejected tender of abandonment and, while reserving all rights and defenses under the policy, denied coverage for the reason that the vessel appeared to have been beyond the navigational confines of the policy (Joint Exhibit #1). Plaintiff hired a diver to attend to the wreck and to determine the feasibility of raising it. Plaintiff was also required to rent a buoy for marking the wreck because of the Coast Guard's insistence that it constituted a hazard to navigation. The Tug TRUDY B was subsequently raised in March, 1970, at a cost of $18,000.00. Having concluded that the vessel was a total constructive loss,[3] plaintiff sold the wreck for the sum of $1.00 to Gulf Marine Surveyors who bore the expense of raising.

It is undisputed that defendant issued its Ocean Marine term policy V–57424 on the steel Tug TRUDY B owned by plaintiff; that plaintiff paid a premium of $3,262.50; that the TRUDY B sank within the time period specified in the policy; and that the defendant was timely notified of the casualty but has not made any payments under the policy nor returned the premium, or any part thereof, to the plaintiff.

Plaintiff has brought this suit to recover from defendant the full insured value under the policy, "sue and labor" expenses and penalties for the defendant's alleged arbitrary and capricious failure and refusal to pay to plaintiff the amount claimed under said policy.

Defendant takes the position that the policy issued does not cover the loss occasioned by the vessel's sinking on the grounds that several terms and conditions of said policy were breached by plaintiff prior to and at the time of the sinking, namely: (1) that the vessel

3. Defendant, at page 1 of its pre-trial memorandum conceded that the TRUDY B, after sinking on October 17, 1969, was a total constructive loss.

was not within the navigation limits of the policy thereby suspending coverage; (2) alternatively, if the vessel had re-entered the navigation limits and sank therein, the policy did not reattach since the vessel was not seaworthy at the time of re-entry; (3) a breach of the management warranty; (4) that the sinking did not result from a peril of the sea, but from the unseaworthiness of the vessel known by the owners; and (5) failing to notify the defendant of the grounding and the resulting damage thereby depriving defendant of its right to survey the vessel after every accident. Plaintiff contends that these defenses are without merit and, in the alternative, that defendant should be estopped from asserting any defense other than breach of the policy's navigation limits, numbered (1) above.

## I.  ESTOPPEL

■ The plea of estoppel urged by plaintiff is based on the ground that defendant initially denied coverage under the policy for breach of the navigation limits and merely added other defenses at its convenience. In support of this plea plaintiff relies on the following rule of law: "When a party to a contract refuses to perform and bases its refusal on one ground it will be held to have waived all other grounds and to be estopped when suit is brought from setting up other grounds for its refusal." [4] We need not determine the propriety of applying such rule to the case at bar since plaintiff is in error as to its major premise. On October 20, 1969, only three days after the sinking of the TRUDY B, defendant sent plaintiff a telegram [5] in which it not only denied liability for the reason that the sinking occurred outside of the policy navigation limits but also specifically reserved all

of its rights and defenses under the policy.[6]

Plaintiff also contends that defendant should not be allowed to defend on any basis because of its failure to tender a return of the premium. As authority for this proposition plaintiff cites Cass Bank & Trust Co. v. National Indemnity Co., 326 F.2d 308 (8th Cir. 1964) and Phoenix Assurance Co. of New York v. City of Buckner, 305 F.2d 54 (8th Cir. 1962). Both cases, which involve the application of Missouri law, are inapposite for they hold that a tender or return of premium is a prerequisite for defending on the ground that a policy is void *ab initio*. We do not construe the defenses raised by the underwriter as contending that the policy sued on was void *ab initio*. On the contrary, said defenses are based on the policy, its terms and conditions.

■ We note with considerable interest, however, the language of the policy with respect to the management warranty clause:

"It is agreed that if, during the currency of this Policy, the Assured's interest in the Vessel hereby insured shall change or there shall be any change in the management of the Vessel, this Policy shall become null and void from the date of such change unless such change shall have been assented to in writing by the Underwriters. In event of such termination a pro rata daily return of net premium shall be made."

Defendant argues that a change in management of the vessel occurred prior to the time of its sinking and that the policy terminated as of the date of said change; yet defendant has neither tendered nor made any pro rata daily return of the net premium. Defendant's

---

4.  This "rule" is contained in a footnote to an annotation in 18 A.L.R.2d 491 § 31 which treats with the insurer's inability to raise the defense of the insured's failure to give written notice of a claim where the insurer has previously denied coverage on some other ground.

5.  Joint Exhibit #1.

6.  Fireman's Fund Exhibit #2 and Plaintiff's Exhibit #9.

retention of the entire premium, in view of the policy language, seems inconsistent with its contention that the policy had been terminated prior to the sinking of the vessel. Understandably such conduct on the part of defendant, if allowed, would work to the detriment of the plaintiff in that plaintiff would have neither a proportionate return of the premium nor the protection of the policy which said premium was to secure. Both Federal and Louisiana decisions require that a defendant be held estopped from asserting a breach of warranty in its defense where its actions are inconsistent with a denial of liability. Reliance Ins. Co. v. The Escapade, 280 F.2d 482 (5th Cir. 1960); Kahmann & McMurry v. Aetna Ins. Co. of Hartford, Conn., 242 F. 20 (5th Cir. 1917); Sholes v. Continental Casualty Company, 196 So.2d 680 (La.App. 4th Cir. 1967).

A holding on this issue would be in accord with the decisions which recognize that an insurer may be estopped by its conduct from insisting upon a forfeiture provision of the policy, but that coverage or restrictions on coverage may not be extended by the application of the doctrine of waiver or estoppel. Reisman v. New Hampshire Fire Insurance Company, 312 F.2d 17 (5th Cir. 1963); Reliance Insurance Company v. The Escapade, supra. See also C. E. Carnes & Co. v. Employers' Liability Assur. Corp., 101 F.2d 739 (5th Cir. 1939) (applying Louisiana law). However, a holding on the issue of estoppel with respect to the management warranty clause is not required, for we are convinced that the warranty was not breached.

## II.  THE MANAGEMENT WARRANTY CLAUSE

Defendant points to several factors which indicate that prior to her sinking the TRUDY B was managed and operated by M. & L. Boat Rental, Inc. (hereafter M. & L.), an entity separate and apart from the assured, Lemar. The evidence further revealed that M. & L., in business as a boat rental broker-age company, was solely owned by Leroy Buras and Marcus Smith who also served as its officers. Primarily M. & L. handled the chartering of Lemar's vessel, arranged for her repairs and furnished her crew. It was established that Buras and Smith together owned 50% of the stock of Lemar and at the time of the voyage and sinking in question they were its managing officers; Buras served as president and Smith was secretary-treasurer.

We find that Leroy Buras and Marcus Smith, whether acting on behalf of Lemar or M. & L., retained direction and control of the vessel. We, therefore, conclude that here there was no change in the management of the vessel as opposed to the change found in Whiteman v. Rhode Island Insurance Co., 78 F. Supp. 624 (E.D.La.1948), the decision relied on by defendant herein.

## III.  NOTICE OF CASUALTY

Underwriter next contends that the policy was voided by the assured's failure to give prompt notice of the grounding and the damage resulting therefrom, and that underwriter was thereby denied its right to survey the vessel after every accident.

Apparently the underwriter is contending that when the assured received notice, on October 16, of the grounding which occurred on the prior night, that information should have been immediately conveyed to the underwriter by the assured. The policy requires prompt notice of any casualty so that underwriter will have reasonable opportunity to be represented at a survey of the damage. However, underwriter offered nothing to show that such a survey would have been required or whether one would have been conducted on the West Pearl.

The assured first learned that the TRUDY B was having trouble on the morning of the 16th when it received a call from the Jahncke people and was advised that a pump had been taken to the tug. Captain Bearb later called and informed the assured that the tug had

been holed and was taking water but that the pumps could control the flow. Bearb was instructed to secure the leak in the best possible manner and to proceed immediately to a yard on the Harvey Canal where the necessary repairs could be effected. Leroy Buras, president of the assured corporation, admitted that he did not consider having temporary repairs made on the West Pearl nor did he consider contacting the underwriter to have a survey made.

■ Both the captain and the assured believed that it would be entirely safe for the TRUDY B to make the return voyage to the Harvey Canal. Under the circumstances then known, it can be said that the assured acted in an ordinarily prudent manner in directing the immediate return of the vessel. While the assured has a duty under the policy to promptly report any casualty, it has been held that every seemingly trivial accident which occurs need not be reported. Utah Home Fire Ins. Co. v. Mechanical Equipment Co., 242 F.2d 513 (5th Cir. 1957). In Utah Home Fire Ins. Co., supra, the TUNA FISH grounded and, while being towed to its home yard in Houma, flooded and sank. There the assured was not held to have breached a similar notice clause in failing to notify the underwriter of the grounding. There it was also significant that the libellant felt that he had no claim under the policy since the anticipated damage did not exceed the deductible.

■ Nothing in this record indicates that the assured considered whether he had a claim under the policy; however, our attention is directed to the policy provision which contains a $2,000.00 deductible resulting from any one casualty. It is likely that the extent of the damage, then known to the assured, was within the $2,000.00 deductible. On the authority of Utah Home Fire Ins. Co. v. Mechanical Equipment Co., supra, we hold that the warranty of prompt notice was not breached. What has just been said relates only to the grounding of the vessel on October 15, for it has been stipulated that underwriter was timely notified of the vessel's sinking.

## IV. NAVIGATION LIMITS

■ It is also stipulated that "the vessel sank . . . within the territorial waters of the State of Mississippi, but less than 50 miles from the shore of Louisiana." The navigation limits of the policy are contained in the clause which reads:

> "Warranted by the Assured limited to the use and navigation of the inland and coastal waters of Louisiana including the Mississippi River not north of Baton Rouge and not exceeding fifty (50) miles offshore."

Underwriter interprets this clause as limiting coverage to an area within the Louisiana State boundary lines extended 50 miles offshore. Thus, underwriter would place the casualty sued on herein outside of such an area since the sinking occurred on the Mississippi side of the extended Louisiana-Mississippi State line. Plaintiff, on the other hand, insists that the clause clearly covers a loss occurring in any water, Louisiana or Mississippi, within 50 miles of the shore or coast of Louisiana.

The issue in dispute, as we see it, hinges on the interpretation of the phrase "coastal waters of Louisiana." In the recent case of Simon v. Switzerland General Insurance Co., 238 So.2d 257 (La.App. 3rd Cir.) writ refused, 256 La. 897, 240 So.2d 232 (1970), a Louisiana Appellate Court was faced with the interpretation of a policy restriction: "Navigation Limits: Inland and Coastal Waters of Texas, Louisiana, and Mississippi." But there the issue was whether the phrase "coastal waters" of Louisiana extended only three miles from land or extended to distances of 30 to 50 miles from the Louisiana coastline. In arriving at the conclusion that an accident which occurred approximately 35 miles south of the Louisiana shoreline was

within the coverage of the policy, that Court reasoned:

" . . . Common sense would seem to dictate that a three mile limitation from land would be as unreasonable, if not an absurd, limit where one is allowed to travel from Louisiana to Mississippi or Texas or even from Texas to Mississippi along the coast.

We feel, in the case at bar, that it would be equally unreasonable if one were allowed to travel 50 miles off shore from a given point on the Louisiana coast and be within coverage, but be denied coverage for venturing into Mississippi waters considerably less than 50 miles from that same point on the Louisiana coast. Common sense would, therefore, dictate that the interpretation of the navigation limits proposed by the underwriter is unacceptable.

A realistic look at the Louisiana coastline, particularly in the area of the Mississippi Sound and the Chandeleur Sound,[7] supports this conclusion. The Chandeleur Islands, within the territorial limits of Louisiana, are approximately 10 miles south, or seaward, of the area in which the TRUDY B went down. Her farthest penetration into Mississippi waters in the Mississippi Sound area was less than 50 miles if measured from the easternmost mainland coast of Louisiana or from the Chandeleur Islands to either point, east or west of the Gulfport channel where (on Exhibit Bearb #1) Bearb marked the locations, at which he said, at various times, he met the oyster boat on the morning of October 17, 1969. The waters of the Mississippi Sound lie within the Louisiana boundary east of Lake Borgne and south of the coast of the State of Mississippi, thus forming the coastal waters of both Louisiana and Mississippi in that area.

We have given what we consider a reasonable construction to the language of the policy, one which is contrary to the contentions of the underwriter. Such a result would have been reached in any event for when the terms of a policy are not clear and are subject to different construction, as is the language here, said terms are construed against the underwriter who has included them in its policy. Simon v. Switzerland General Insurance Co., supra.

We conclude that the vessel had not ventured outside the navigation limits provided in the policy. Having so concluded, we need not consider defendant's contention that the vessel returned in an unseaworthy condition. The grounding of the tug, which allegedly caused the loss, occurred in the inland waters of Louisiana. Its sinking and its travel prior thereto occurred within the navigation limits of the policy.

## V. THE ALLEGED UNSEAWORTHINESS

Underwriter, in its final attempt to avoid liability, contends that the TRUDY B was unseaworthy and that her owners knowingly sent her to sea in said unseaworthy condition. Underwriter further adds that the loss of the vessel was caused by the same unseaworthy condition which, it is contended, is not an insured peril and for which there is no coverage. Such contentions resemble the "double-bottomed defense of avoidance of the whole policy and a negation of damage from an insured peril" raised in cases where the policies in question "contained an express warranty of continuing seaworthiness which was patently breached." Saskatchewan Government Insurance Office v. Spot Pack, 242 F.2d 385, at 388 (5th Cir. 1957).

Before reaching the merits of this defense, we must first determine whether the issues raised herein are to be governed by the law of Louisiana or by that of the sea. In Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), the United States Supreme Court held that the regulation of marine insurance should be left to the states. Justice Harlan, in a later case, remarked that

7. Fireman's Fund Exhibit #1.

"[t]he application of state law in [Wilburn] was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented." Kossick v. United Fruit Co., 365 U.S. 731, 742, 81 S.Ct. 886, 894, 6 L.Ed.2d 56 (1961), cf. Irwin v. Eagle Star Ins. Co., Ltd., 455 F.2d 827 (5th Cir. 1972). The rule to be followed in the Fifth Circuit is that State law should be applied in the field of marine insurance where there is no controlling federal authority with respect to the specific issue before the court. Fireman's Fund Insurance Co. v. Wilburn Boat Co., 300 F.2d 631 (5th Cir. 1962) (on remand), cert. den. 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505. Since the standard of seaworthiness is solidly entrenched in federal maritime jurisprudence, Aguirre v. Citizens Casualty Company of New York, 441 F.2d 141, 146 (5th Cir. 1971), we must apply the federal maritime law.

█ Though the insurance contract on the TRUDY B contains no express warranty of seaworthiness, the Fifth Circuit recognizes that there exists in a time policy, such as the one sued on herein, an implied warranty of seaworthiness. Saskatchewan Government Insurance Office v. Spot Pack, supra; Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co., 247 F.2d 116 (5th Cir. 1957), cert. denied, 355 U. S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260; Gulfstream Cargo, Ltd. v. Reliance Insurance Co., 409 F.2d 974 (5th Cir. 1969). It is impliedly warranted that the vessel is seaworthy as of the very moment of the attachment of the insurance; and if the vessel is in fact unseaworthy at the time the insurance were to attach, the breach avoids the policy. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., supra.

█ Yet the implied warranty does not end there; it is a continuing obligation that the vessel "[o]wner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an un-

seaworthy condition." Saskatchewan Government Insurance Office v. Spot Pack, supra, at 388. However, a breach of the implied negative warranty after the policy has attached does not avoid the policy altogether and only exonerates the underwriter for loss or damage proximately caused by the unseaworthy condition. Saskatchewan Government Insurance Office v. Spot Pack, supra.

There is no allegation that the TRUDY B was unseaworthy as of March 23, 1969, the inception of the policy. The insurance, therefore, became effective as of that date. We noted earlier that defendant was not claiming that the policy was void ab initio. On or about July 12, 1969, the TRUDY B was placed in drydock at Wall Shipyard where her underwater condition and her running and steering gear was thoroughly inspected and overhauled at a cost of $1,018.98.[8] In October, 1969, just prior to her fatal voyage, the TRUDY B was again drydocked at the Wall Shipyard for minor repairs to her bottom.[9] This evidence supports our finding that the shipowner exercised due diligence in maintaining its vessel in a seaworthy condition.

█ The defendant does contend that the crew which manned the vessel on her voyage to the West Pearl was incompetent, thereby rendering the vessel unseaworthy. To escape liability by way of this contention the underwriter must prove that the shipowner had knowledge of this unseaworthy condition, if in fact it did exist, and that said condition was the proximate cause of the loss. Gulf Coast Trawlers, Inc. v. Resolute Insurance Company, 239 F.Supp. 424 (S.D.Tex.1965).

█ Mindful of the rule that the underwriter bears the burden of proving unseaworthiness, we must determine whether the TRUDY B was unseaworthy because of her crew solely on the weight of the evidence and without regard to whatever maritime skills the Court may possess. Saskatchewan Government In-

---

8. Plaintiff's Exhibit #5.

9. Plaintiff's Exhibit #6.

surance Office v. Spot Pack, supra; Hanover Fire Insurance Company v. Holcombe, 223 F.2d 844 (5th Cir. 1955), cert. denied 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787. While seaworthiness is a comprehensive term requiring that the vessel be staunch and strong, fitted out with proper equipment and a sufficient and competent crew, it is also a relative term, relative to the type of voyage or service proposed. Gilmore and Black, The Law of Admiralty 58 (1957).

The concept of seaworthiness extends not only to the vessel and its gear but also to its crew. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). It is clearly the duty of a shipowner to not only provide a crew sufficient in number, June T. Inc. v. King, 290 F.2d 404 (5th Cir. 1961), but also a crew competent for the duties it may be called upon to perform, including provision for any exigency which is likely to be encountered. Petition of United States, 303 F.Supp. 1282 (E.D.N.C.1969) aff'd Petition of United States & Marine Transport Lines, Inc., 432 F.2d 1357 (4th Cir. 1970); Empire Seafoods, Inc. v. Anderson, 398 F.2d 204 (5th Cir. 1968); Admiral Towing v. Woolen, 290 F.2d 641 (9th Cir. 1961).

"Seaworthiness, as that term has been defined and redefined, is reasonable fitness to perform or do the work at hand." Walker v. Harris, 335 F.2d 185 (5th Cir. 1964), cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964). *Walker* teaches that the answers to the following questions will lead to the ultimate conclusion as to the seaworthiness or unseaworthiness of the vessel: "What is the vessel [here the crew] to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny [here the crew], sufficient to withstand those anticipated forces? If the answer is in the affirm-

ative, the vessel (or its fitting) is seaworthy." 335 F.2d at 191.

The TRUDY B was hired to take two empty barges from a location on the Industrial Canal to a loading facility on the West Pearl River and to return with the loaded barges, a voyage requiring navigation through inland waters only. To accomplish this task the TRUDY B was manned by Captain Ronald Bearb, a mate and a deckhand. The tug had no radar but was equipped with a liquid compass. The Jahncke people on the Industrial Canal provided Captain Bearb with a map of the Intracoastal heading east and showing the way to the railroad bridge and from there to the mouth of the West Pearl. Bearb testified that there were no charts of the West Pearl aboard the tug and that he found the river difficult to navigate because of its many bends. Though the record is not clear, there is some evidence that someone was to meet the TRUDY B on the West Pearl to assist in the navigation of that river; but upon the tug's arrival at the Highway 90 bridge Bearb found no one and took the vessel upriver himself. We are unable to determine whether that person was to be someone connected with Jahncke or Lemar.

Captain Bearb was 21 years old at the time the voyage commenced. He left school at 14, after completing the sixth grade, and farmed until he was 16, when he began working on boats. Apparently, he worked for one employer for about three years as a deckhand and one month as a mate on a tug. When he was laid off, he returned to farming for about eight months, following which, in 1969, he was employed for approximately seven months as skipper of a crew boat transporting personnel from Dulac, Louisiana, offshore in the Gulf of Mexico. He claimed that as skipper of the crew boat he would run 100 to 150 miles on compass. His crew boat had charts aboard which he claimed he could read and from which he said he could fix a compass course.

It should be noted that in his testimony concerning events following the TRU-

DY B's departure from the railroad bridge on its return voyage to New Orleans on the night of October 16, 1969, Bearb testified that a 90° turn would have turned the vessel in the direction from which it was then proceeding and that a 160° turn would be a full circle.

After his employment aboard the crew boat terminated he was hired by Leroy Buras, with the knowledge of Marcus Smith, following the hurricane "Camille" which struck Louisiana and Mississippi in late August, 1969. He worked as mate aboard the tug CAPTAIN SCOTT, an M. & L. vessel, for about one month and then went to M. & L.'s KENDALL S, during which a part of the time he acted as captain. Since he went aboard the TRUDY B on October 14, 1969, the total time he served on the KENDALL S was about two weeks, one of which probably was as mate and the other as captain.

Bearb's first assignment aboard the TRUDY B was that which took him on the voyage to the Pearl River and then into the waters where the vessel sank, at which time his period of service as captain of the TRUDY B was only about 2½ days.

Bearb had not previously been in the Intracoastal Canal east of the Mississippi River, the Pearl River or the Mississippi Sound, but he had worked in Breton Sound which is east of the Mississippi River and adjacent to Chandeleur Sound, his experience, except when working as crew boat skipper, having been confined to inland waters in Louisiana. Bearb had no formal training as a tugboat captain nor was he so licensed by the Coast Guard.

Raymond Landry, master of the CAPTAIN SCOTT with 15 years of experience as a tugboat captain, testified that Bearb was able to handle sizable four-barge tows and that Bearb occasionally relieved him as captain aboard the CAPTAIN SCOTT. As earlier noted, Bearb's service on the CAPTAIN SCOTT was only for a period of about one month. Landry further testified that the operations of the CAPTAIN SCOTT were primarily confined to inside waters. Landry considered Bearb well qualified to serve as a tugboat captain and recommended him for that position when, due to the illness of another captain, Bearb was offered and did accept the position of captain aboard the tug KENDALL S.

Neither the mate nor the deckhand were called to testify. Defendant's attempt to have their out of court statements admitted into evidence was aborted when plaintiff's objection thereto was sustained. Bearb testified that the deckhand's first service was aboard the TRUDY B on this occasion. He also testified that he had been acquainted with the mate before the latter entered the armed forces and had previously worked with him on the vessels of another boat operator. The evidence further indicates that the mate had one year's prior service as a deckhand and one month's prior service as a mate. Bearb testified that he employed the mate for service aboard the TRUDY B, but didn't know if the mate had ever been in the Intracoastal Canal east of the Mississippi River previously or whether he could read charts.

As president of Lemar, Leroy Buras was in charge of hiring the captains and crews for the TRUDY B. Apparently, as a normal procedure he required that captains have four years on tugs and that mates have 18 to 24 months on deck with knowledge of handling tugs.

But Buras testified that he delegated to Bearb, who began working for his various companies in August, 1969, when he later became captain of the TRUDY B, the hiring of the mate and deckhand. Although he acknowledged it was his obligation to see they were qualified, he was not aware that the mate had only served as a deckhand one year and as mate only one month previously, nor did he check into their prior experience.

As to Bearb, Buras stated he knew Bearb had worked on boats and had the

experience necessary to be captain; but he also testified that he didn't know what Bearb's qualifications were, had never worked with Bearb aboard vessels, gave him no examination, knew he had no license, his company had no personnel records and didn't know how long Bearb had been on the TRUDY B at the time of the sinking. Furthermore, he acknowledged that he knew Bearb was not familiar with the waters in the Pearl River area.

The tug experienced no difficulty on her voyage from New Orleans through the Intracoastal Canal and with the aid of the map provided by the Jahncke people easily found the mouth of the West Pearl after passing the railroad bridge which crosses the Rigolets. On deposition Bearb estimated that it took the tug 2 hours to run the Intracoastal and another 2 hours to reach the mouth of the West Pearl. On trial, however, Bearb stated that it took about 5 hours to navigate from the Intracoastal to the mouth of the West Pearl, a distance which he estimated to be about 7 miles but which is actually less than 3 miles. Bearb explained that because of the shallow water between the Intracoastal and the mouth of the West Pearl he had to put his two empty barges astern and proceed at a slow speed. However, the chart shows that there is little, if any, shallow water in that area.

Other than the grounding, during the voyage up the West Pearl on a number of occasions the tug got stuck. In all it took more than 30 hours from the time the tug entered the winding West Pearl for her to reach the Jahncke facility some 80 miles from the river's mouth.

The TRUDY B, in her damaged condition and without her barges, departed the Jahncke dock near 3:00 p. m. on the afternoon of the 16th. After running for only 8 hours she reached the mouth of the West Pearl. It was then 11:00 p. m. and somewhat hazy. On clearing the railroad bridge at about 11:30, Bearb testified that the weather appeared good and that it was not necessary to lay a compass course to Catfish Point for he could see the point and the shore line on each side. Bearb claims to have hit a solid fog bank at about 12:00 midnight.

From the railroad bridge to the channel of the Intracoastal Waterway below Catfish Point the distance is shown to be slightly over one mile. Catfish Point is less than a mile from the railroad bridge and, as Bearb testified, was visible from the railroad bridge. There are two flashing lights in the area of Catfish Point, one at the Intracoastal Waterway and the other slightly to the southeast of the first light. Apparently, Bearb had used one of those lights in navigating from the Intracoastal toward the mouth of the West Pearl en route to the Jahncke facility.

The light at the Intracoastal Canal channel is approximately one mile from the railroad bridge and should have been seen by Bearb upon his departure from the bridge if, as he testified, the weather was sufficiently clear for him to see the land at Catfish Point at that time. He also testified that the fog set in at about midnight, 30 minutes after the time of his claimed departure from the railroad bridge. Bearb testified that the tug was making about nine miles per hour after leaving the railroad bridge and before running into the fog, the point of which he indicated on the chart, (Exhibit "Bearb #3") by an arrow placed approximately opposite Catfish Point, a distance of less than one mile from the railroad bridge. If the tug's speed was nine miles per hour during the 30 minutes after departure from the railroad bridge when Bearb claimed the fog set in, he would have been nearly five miles from the railroad bridge and approximately four miles south or southeast of Catfish Point when the fog set in.

The tug, running at a speed of nine miles per hour, should have reached the channel of the Intracoastal with the

lights in full view after only 10 minutes, or at 11:40 p. m., if the fog did not set in until midnight.

Bearb testified that after running in the fog for a few minutes he became nervous and then executed a 90° turn which he expected would bring him back to the railroad bridge. We infer, considering that the vessel was later determined to be in the waters of the Mississippi Sound off the Gulfport-Biloxi area, that the 90° turn was to port and that if it was executed in the proximity of the point indicated by Bearb on the chart where the fog was to have set in, Bearb would have run the tug aground shortly thereafter at some point opposite and to the east-northeast of Catfish Point.

Bearb testified that during the night he ran his engines at idle speed or about two miles per hour. At such rate of speed there would have been no way he could have traveled over 30 miles between midnight and 4:00 a. m. What is even more incredible is that Bearb could have reached a point off the Gulfport-Biloxi area without having grounded at some point previously considering the shallow waters en route to that area from Catfish Point, the fog claimed to be present and Bearb's complete lack of knowledge of the waters he traversed.

Nevertheless, the TRUDY B proceeded in excess of 30 miles in an easterly direction to the point where she encountered the oyster boat off the Mississippi Coast.[10]

Bearb's testimony concerning the location where he encountered the oyster boat, which he previously said was a shrimp boat, and his testimony with respect to the course he followed to where the vessel sank near bouy # 25 in the Gulfport Channel is hopelessly confused. On deposition Bearb stated that he encountered the oyster boat west of the Gulfport Channel. From there, a 210° course which Bearb said he was given by the oyster boat crew would not have taken him to the Gulfport Channel but would have headed him in the direction of the Intracoastal. On trial Bearb testified that he located the oyster boat east of the Gulfport Channel and had he steered the 210° course from there it would have brought him into the Gulfport Channel at some point north of its intersection with the Intracoastal. At all events, when the TRUDY B sank she was in the Gulfport Channel about six miles south of the point where the Intracoastal intersects with the Gulfport Channel.

About seven hours after the TRUDY B encountered the fog as Bearb claimed, she sank as previously mentioned above. Had she found Catfish Point and the Intracoastal Waterway between 11:30 p. m. and midnight on the night of October 16th, she probably would have reached New Orleans and a safe harbor long before 7:00 a. m. on the 17th. Bearb testified that on the voyage from New Orleans the tug, with barges in tow, was averaging about seven miles per hour and that the distance from the Industrial Canal where the voyage began to the point where the tug left the Intracoastal Waterway to proceed past the railroad bridge to the mouth of the West Pearl was approximately 20 miles. Using the tug's estimated speed of seven miles per hour with barges in tow, the return trip to New Orleans from that point would have required approximately three hours. Using an estimated speed of nine miles per hour, which Bearb claims he was maintaining after leaving the railroad bridge on the return voyage, the tug, without her tow, could have reached New Orleans from that point sometime between two and three hours.

However, the TRUDY B did not reach New Orleans. During the seven hours from the time of departure from the

10. The distance from Catfish Point to Gulfport is about 35 miles and to Biloxi is about 42 miles.

railroad bridge she took an a quantity of water which contributed to her sinking.

Fred Perrin, a marine surveyor who examined the vessel on March 11, 1970, after she had been raised, testified that the grounding of the TRUDY B not only caused her to be holed but also caused damage to the vessel's propeller shaft struts. It was Perrin's opinion that the damage to the struts caused the propeller shaft to whip which in turn caused the packing glands in the stuffing boxes to become disarranged so as to eventually allow the influx of an amount of water sufficient to cause the sinking. It was also his opinion that the crack opened by the grounding would not have permitted the entry of such a quantity of water which could have overcome the vessel's pumps and caused her to sink. Perrin's testimony was substantiated by the survey report made at the time of his examination.[11]

We conclude that the crew of the TRUDY B, and particularly its captain, was incompetent at the commencement of the voyage, thus rendering the vessel unseaworthy at that and subsequent times and that such unseaworthiness proximately resulted from the owner's neglect in failing to determine the qualification and competence of the crew to man the vessel for the intended voyage before its commencement. We further conclude that such unseaworthiness was the proximate cause of the loss of the TRUDY B. And since the unseaworthiness was caused by the incompetence of the crew, and not by the negligence of the master or crew, the Inchmaree clause is thus inapplicable.

Having so breached the implied warranty of seaworthiness, plaintiff is not entitled to recover. Accordingly, judgment shall be entered for the defendant dismissing plaintiff's suit at its cost.

This opinion shall serve as our findings of fact and conclusions of law.

11. See Plaintiff's Exhibit #10.