ALFORD, Judge.
Third party plaintiff, Grand River Towing, Inc. (GRT), appeals the trial court’s judgment dismissing its claim against third party defendant, Corroon & Black (C & B), an insurance broker.[1] The trial court also dismissed the third party petition of Ennia General Insurance Company, Limited (U.S. Branch) (Ennia) against C & B. However, Ennia did not appeal and that portion of the judgment is final.
GRT, as owner of a vessel named “Caroline M” contracted with C & B to secure insurance against fire and other damage to the “Caroline M” and another vessel. The communications and negotiations between GRT and C & B were handled by Jack T. Marionneaux, sole shareholder and president of GRT, and Michael N. Brown, senior vice president of C & B. C & B placed the hull insurance with Ennia, through Ennia’s general agent and underwriter, Commercial Marine Underwriters, Inc. (CMU). The policy, which showed a value for the “Caroline M” of $250,000, was for the period of November 30, 1980, to November 30, 1981. GRT’s purchase of the vessel was financed through Plaquemine Bank and Trust Company (Plaquemine Bank), with the bank being named on the policy as a loss payee.
On August 24, 1981, the “Caroline M”, while under a bareboat charter to Vegas Marine, Inc. (Vegas) was severely damaged by fire and later declared a constructive total loss. Ennia denied coverage. When the installment payments became delinquent, Plaquemine Bank filed the instant suit on November 23, 1981, against GRT, Marionneaux and Ennia. GRT answered and filed third party demands against En-nia, and in the alternative, against C & B, on December 11, 1981. Within the appropriate delays, GRT confirmed a default judgment in excess of $360,000 against En-nia on January 11, 1982. Ennia appealed suspensively. On March 26, 1982, Ennia filed a third party demand against C & B. While the appeal was pending, GRT, Mari-onneaux and Ennia entered into a settlement and compromise for $200,000, with each party to the settlement reserving the right to pursue claims against C & B. GRT’s obligation to Plaquemine Bank was satisfied out of the settlement funds. Both GRT and Ennia pursued their third party demands against C & B. As stated by the trial court, “[t]he common thrust of these parties ... is that Brown of C & B improperly handled the bareboat charter vis a vis insurance coverage thus causing Ennia to pay a claim it did not owe and causing GRT and Marionneaux to accept an amount in settlement far less than they were entitled to receive.” After hearing extensive testimony and reviewing the evidence, the trial court dismissed both third party demands against C & B, finding that Brown had reasonably assumed that “CMU had accepted the coverage for Ennia” and that Ennia, through the actions of its underwriter, was “clearly estopped from denying coverage.”
C & B’S ACTIONS
GRT appeals, alleging that the trial court erred in concluding that an insured has no *66 rights against a negligent insurance broker unless the broker’s negligence had the legal effect of destroying insurance coverage. GRT contends that even if GRT had coverage under Ennia’s policy, the broker is liable if its negligence harmed the insured by creating a coverage dispute. However, it is apparent from a review of the trial court’s reasons for judgment that there was no finding that C & B was negligent or failed to exercise reasonable diligence in the instant case. Therefore, the issue is whether or not the trial court’s findings were clearly wrong.
According to the record, the policy on GRT’s vessel, which was orally bound between Brown and Joseph R. Rossiter of CMU by telephone in November 1980, provided that the loss payee, Plaquemine Bank, would receive ten days prior written notice “[i]n the event of cancellation of or material change in policy.” The policy also included a standard provision in the “change of ownership” clause which states, in pertinent part, that
In the event ... the Vessel be placed under new management, or be chartered on a bareboat basis ... then, unless the Underwriters agree thereto in writing, this Policy shall automatically terminate at the time of such ... charter_
C & B forwarded the policy to Rossiter on January 22, 1981, for the underwriter’s signature.
Sometime in March of 1981, Marionneaux informed Brown that he was considering a bareboat charter of the “Caroline M.” Brown told Marionneaux to inform him of the charter contents so that C & B could obtain the approval of CMU in order to avoid termination of the policy. Brown testified that he did not anticipate any problems with CMU in regard to the bare-boat charter because they had bareboat chartered another of GRT’s vessels a few months earlier with no problems. Marion-neaux told Brown that under the bareboat agreement, Vegas was granted an option to purchase the vessel for $300,000 and that they would obtain their own insurance in about two weeks, but that Marionneaux wanted to be assured that his own coverage remained in effect until Vegas obtained its own policy. On April 7, 1981, Marionneaux called C & B to advise Brown that the charter had been signed effective that date. Brown or his assistant, Dora Cook, immediately telexed CMU about the charter; however, CMU’s telex was inoperative that day. On April 8, 1981, Ms. Cook both telephoned and sent a letter to Aleida Martinez, Rossiter’s secretary at CMU, which stated in pertinent part:
“CAROLINE M” bareboat chartered effective 4/7/81 by Vegas Marine Service, Inc.,, (sic) New Iberia, La. New vessel operators wish to continue insurance for their account. Please quote to increase hull value to $300,000, in lieu of $250,000. New operators have not previously owned vessels and have no losses. Vessel will work between Houston and New Orleans towing two tank barges working for Ellis Barge Line of Houston. When purchase of vessel is completed new owners will wish to re-issue policy in their name. Please confirm coverage under new operators and advise additional premium for new value.
On April 14, Ms. Martinez telephoned Brown in response to the April 8 letter. Brown wrote on his copy of the letter the note that “Aleta says J.R. quotes 3.5% hull Wants exp (experience) of new owners with this and other past operations” (Parenthesis ours). Rossiter testified that on April 13, he wrote a note on the bottom of his copy of the letter and mailed it back to Brown. The note stated “New annual rate for value of $300,000 would be 3.50%. Pri- or to agreement please provide experience of new owners in operations such as this in past.” Brown denied ever receiving a copy of Rossiter’s note. C & B never prepared a written policy endorsement showing Vegas as bareboat charterer.
The original policy was finally delivered to GRT on or after June 5,1981. Rossiter testified that he had no idea when the countersigned policy was sent to C & B. Brown testified that C & B’s practice was to immediately deliver the signed policies to the insured, either personally or by mail with a cover letter. C & B’s cover letter was dated June 5, 1981. The policy as *67 delivered contained no notice that it had been cancelled or voided because of the bareboat charter.
Vegas did not acquire its own insurance and did not exercise its option to purchase the “Caroline M.” Marionneaux advised Brown of Vegas’ failure to act and reiterated that he wanted his insurance to remain in effect. Brown assured Marion-neaux that it was. Since Brown was slated to leave C & B on July 27,1981, he dictated a letter to Ms. Martinez in which he indicated that the vessel was still under the bareboat charter, that Vegas had never exercised its option to purchase and that GRT was billing Vegas for the cost of the present policy premium. The letter also stated that C & B did not respond to CMU on the quote for additional coverage since Vegas had indicated they had received a lower quote elsewhere. The letter was signed by Irwin L. Cucullu, vice president of C & B, since it was not dated until July 28, 1981, after Brown had left C & B.
Two marine insurance brokers testified as experts, one saying that CMU’s actions did not constitute an acceptance of insurance for the bareboat charter, the other saying their actions did since CMU never advised C & B they were invoking the sanctions of the “change of ownership” clause. Both stated that Rossiter (CMU) was on notice of the bareboat charter and of C & B’s request for confirmation of coverage, and that the notice warranted additional action by Rossiter. They disagreed as to the meaning of the action taken by Rossiter.
As this court stated in Amone v. Anzalone, 481 So.2d 1047, 1049 (La.App. 1st Cir.1985):
An insurance agent or broker who undertakes to procure insurance for a client owes an obligation to his client to use reasonable diligence in attempting to place or obtain the requested insurance . and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent or broker the loss he sustains as a result of the failure to procure the desired coverage if the actions of the agent or broker warranted an assumption by the client that he was properly insured in the amount of desired coverage.
See also Karam v. St. Paul Fire & Marine Insurance Company, 281 So.2d 728 (La. 1973); Cusimano v. St Paul Fire and Marine Insurance Company, 405 So.2d 1382 (La.App. 1st Cir.1981), writ den., 410 So.2d 762 (La.1982).
A review of the trial court’s reasons for judgment shows that the trial court apparently believed that Brown exercised reasonable diligence in acquiring coverage for the bareboat charter. The court factually determined that Rossiter’s secretary called Brown with Rossiter’s comments on April 14, rather than sending Brown a copy of the letter with Rossiter’s notes;, that both the April 8 and the July 28 letters advised CMU that GRT’s vessel was under a bareboat charter and the July 28 letter indicated that C & B assumed coverage had not been voided; that Rossiter would not have quoted additional coverage on a voided policy; and that Brown’s assumption that his telephone conversation with Rossi-ter’s secretary confirmed continued coverage and that the letter of July 28 further evidenced this coverage was not unreasonable.
It is well settled that the trier of fact actually hearing and observing the witnesses give live testimony is in a better position to evaluate the credibility of witnesses than a reviewing court on the intermediate level, which at best can only study written words in a cold record. Kikendall v. American Progressive Insurance Company, 457 So.2d 53 (La.App. 1st Cir.1984). In regard to expert testimony, the trier of facts is not bound by such testimony, but the evidence of an expert is received in the same manner as nonexperts, and is to be weighed by the trier of fact the same as other evidence. Aaron v. Bankers and Shippers Insurance Company of New York, 475 So.2d 379 (La.App. 1st Cir.1985). After a careful review and evaluation of the record, we are unable to say that the trial court was clearly wrong in its findings. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
*68 ESTOPPEL OF ENNIA
GRT also alleges that the trial court erred in concluding that Ennia was es-topped from relying on the automatic termination provisions of the policy.
The record shows that Ennia had knowledge of GRT’s bareboat charter agreement with Vegas, that C & B requested confirmation of continued coverage as well as a quote for more insurance, and that upon purchase, the new owners wanted to have the policy reissued in their names. Rossi-ter’s reply was to quote a new rate for the increased value and to request the experience of the new owners “prior to agreement.” At no time did Rossiter or anyone at CMU advise that the provision voiding the existing policy was being invoked, nor did anyone advise Plaquemine Bank of the termination of the policy as required by the policy, nor did CMU refund the prepaid policy premium to GRT until November 30, 1981, three months after the loss was sustained and seven months after Rossiter claims he considered the policy terminated, nor did Rossiter or anyone at CMU respond to C & B’s letter of July 28, 1982, which clearly indicated that C & B considered the original policy to still be in effect. Addi- ' tionally, the record indicates that the policy was delivered to GRT more than a month after the bareboat charter went into effect, without any notation that it was void or cancelled. The marine insurance experts disagreed as to whether CMU’s actions and/or inaction constituted continuance of GRT’s coverage. One considered C & B’s letters ambiguous and insufficient to bind the underwriters and indicated that Rossi-ter’s handwritten note evidenced a lack of consent to continue coverage. The other expert testified that in twenty-five years of securing marine insurance he had never seen an underwriter send a written confirmation of coverage and that underwriters “will let you know if coverage is not, if they consider it not bound.” He also indicated that CMU had the obligation to expressly invoke the sanction of the “change of ownership” clause by advising C & B, and that absent any response negating coverage, he considered coverage in effect.
The trial court, based on the testimony of Rossiter and Brown, determined that the delay in delivering the policy to GRT was attributable to CMU. The trial court also found Rossiter’s contentions that he considered the April 8 letter as a mere request for a rate quotation in the event of a sale of the vessel and that a response from him to C & B to the effect that the policy was voided was unnecessary because Brown was a “big boy” to be “incredulous.” Based on Rossiter’s actions and inaction, the trial court determined that CMU, and thereby Ennia, continued to treat GRT’s policy as if it was in effect after acquiring knowledge of the bareboat charter. Such findings are not clearly wrong and will not be disturbed.
A defendant may be estopped from asserting a breach of warranty in its defense where its actions are inconsistent with a denial of liability. Lemar Towing Co., Inc. v. Fireman’s Fund Insurance Company, 352 F.Supp. 652 (E.D.La.1972), aff'd. 471 F.2d 609 (5th Cir.1973), cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). As stated in C.E. Carnes & Co. v. Employers’ Liability Assur. Corporation, Limited, of London, England, 101 F.2d 739, 742 (5th Cir.1939):
It is well settled that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground for forfeiture, may not be waived by implication from conduct or action. The rule is that while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage or restrictions on the coverage cannot be extended by the doctrine of waiver or estoppel. The substance of the doctrine of waiver as applied in the law of insurance is that if the insurer with knowledge of facts which would bar an existing primary liability, recognizes such primary liability by treating the policy as in force, he will not thereafter be allowed to plead such facts to avoid his primary liability.
Clearly, in the instant action, CMU was insisting upon a forfeiture provision of En- *69 nia’s policy, i.e. the policy was void because of a change in management. Therefore, the trial court could correctly find that Ennia was estopped from denying coverage, where the actions of its agent, CMU, were inconsistent with such denial.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are to be borne by GRT.
AFFIRMED.
LANIER, J., concurs in the result.

. According to the record, the correct name of the third party defendant is Corroon & Black/Kessler-Bodenheimer, Inc.