CHOTIN, INC. and Chotin Towing Corporation, Libelants,

v.

S.S. GULFKNIGHT, her engines, tackle, apparel, etc., Respondent.

GULF OIL CORPORATION, Libelant,

v.

CHOTIN, INC. and the M/V PATSY CHOTIN, Respondent.

Nos. 5682, 5850.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 30, 1966.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, Gerard T. Gelpi, Edwin K. Legnon, New Orleans, La., for Chotin, Inc., Chotin Towing Corp. and the M/V Patsy Chotin.

Burlingham, Underwood, Barron, Wright & White, Joseph C. Smith, New York City, Terriberry, Rault, Carroll, Yancey & Farrell, Francis Emmett, New Orleans, La., for Gulf Oil Corp. and the S.S. Gulfknight.

AINSWORTH, Circuit Judge:*

These consolidated actions for damages involve a collision which occurred in

* This case was tried before Judge Ainsworth as a district judge prior to taking office as circuit judge.

the Houston Ship Channel shortly after noon on January 29, 1963 between the super tanker GULFKNIGHT and the tow of the M/V PATSY CHOTIN.

The Houston Ship Channel is 400 feet in width with a depth of 35 feet and is marked by buoys and navigational aids. In this particular area the Channel is in Galveston Bay with varying depths of shallower water outside the Channel itself.

The PATSY CHOTIN was proceeding on a voyage from Goodhope, Louisiana, to Pasadena, Texas, and was pushing four steel tank barges in rigid tandem formation, each barge being about 50 feet wide and laden with gasoline, to drafts of about 8½ feet, the over-all flotilla totaling 871 feet in length. It had just made a 90° turn to the right at the junction of the Intracoastal Canal and the Channel and was moving up the Channel.

The GULFKNIGHT was 632 feet in length and 90.4 feet wide. It was also loaded with a cargo of petroleum products, with a draft of 32 feet 4 inches, and was on a voyage from Houston, Texas, to Providence, Rhode Island, moving down the Channel toward the sea.

Within minutes of turning up the Houston Ship Channel from the Intracoastal Canal, the PATSY CHOTIN and tow and the GULFKNIGHT were in head-on collision, the GULFKNIGHT striking the lead barge of the tow, then sliding down the side of the next barge, thence striking the port forward corner of the third barge causing heavy damage, and the impact also damaging the fourth barge. Damage was also done to the starboard and port bows of the GULFKNIGHT.

Each vessel blames the other for the collision, the PATSY CHOTIN contending that it was on its starboard (east) side of the Channel when the GULFKNIGHT suddenly took a sheer to its port side, into the path of the PATSY CHOTIN striking its tow, and the GULFKNIGHT asserting that the PATSY CHOTIN was on the west edge of the Channel when the tug suddenly changed course, swung her tow to the right in a "foolhardy maneuver" and across the Channel toward the east side into the path of the tanker with an inevitable accident as the result.

The PATSY CHOTIN was being piloted at the time by Captain Lasseigne who was alone in the wheelhouse, performing the duties of pilot, lookout, radio operator and radar observer. No lookout was stationed on the forward barge or anywhere else. The GULFKNIGHT presented a full complement on the bridge, with its master, state pilot directing navigation, second mate, a helmsman at the wheel and a lookout on the bow. All testified in person, except the helmsman and lookout whose testimony was received by deposition. The PATSY CHOTIN's pilot and four of the GULFKNIGHT's crew were eyewitnesses, the witnesses generally supporting the side by which they were called.

We are confronted, therefore, with credibility choices, as well as the duty of drawing reasonable inferences from all of the testimony, from the physical facts, and from the circumstances. There emerges from this greatly conflicting mass of evidence a firm conviction that the PATSY CHOTIN and the GULFKNIGHT were mutually at fault and damages should, therefore, be divided. Our further findings follow:

Visibility was somewhat limited during the morning of the accident, caused by intermittent fog. However, at midday visibility had improved so that visual observation of each vessel by the other was possible.

When Captain Lasseigne turned his lengthy tow from the Intracoastal Canal into the Channel on the day of the collision, he moved into a channel with which he was quite unfamiliar, having last piloted a vessel there in 1957, six years earlier. He had made no check of the chart of the area, did not know specifically where to turn from the Canal into the Channel, and was not too familiar with the channel buoys, either as to their number or location. He impressed us as

being somewhat bewildered, not knowing exactly where he was when he turned the PATSY CHOTIN into the Channel. Despite his testimony that he shaped up his tow on his starboard (east) side of the Channel, we believe he actually was considerably on the west side, which was the wrong side as to his tow. The PATSY CHOTIN proceeded up the Channel at moderate speed of about 2 to 3 miles per hour over the ground, closing with the downbound GULFKNIGHT which Captain Lasseigne had first sighted on radar two miles away, and visually sighted about one-half mile distant, proceeding down Channel.

The GULFKNIGHT was moving in mid-channel at a speed of at least 7½ knots over the bottom, her engines being at half ahead. Its radar first observed the PATSY CHOTIN more than a mile away, and the tow was visually observed at a distance of about a mile. At that time the PATSY CHOTIN was several degrees off the GULFKNIGHT's starboard bow.

The vessels continued to close with each other, and the PATSY CHOTIN then began to move across the Channel from west to east, or its own port side to starboard side, sounding one blast for a port-to-port passing. The GULFKNIGHT sounded no passing signals at that time or at any other time preceding the accident. When the head of the tow reached mid-channel the GULFKNIGHT then realized that a collision was inevitable, sounded the danger signal, stopped and reversed her engines, and about a minute later, according to the deck bell book entries, ran into the barges in the tow which were angling across the Channel. The GULFKNIGHT also dropped anchor, but there is the conflicting testimony whether this occurred before or after the ac-

cident. In our view the anchor was dropped immediately at the time of the actual collision. The GULFKNIGHT still with headway proceeded down the Channel for some distance (at least several ship lengths) after the accident before it was stopped. At the time of the collision the PATSY CHOTIN also reversed her engines.

The Narrow Channel Rule, Article 25 of the Inland Rules,[1] requires that vessels proceeding in a narrow channel, such as the Houston Ship Channel, keep to the right. The evidence definitely shows a violation of this rule by the PATSY CHOTIN and that this was one of the prime causes of the accident. The PATSY CHOTIN had moved well to the port (west) side of the Channel in violation of this rule. Thereafter, by angling across the Channel from its port side toward the starboard side, the PATSY CHOTIN compounded its fault. Its pilot was unfamiliar with the area and seemingly unable to locate the Channel when he turned from the junction of the Intracoastal Canal. There is no doubt, therefore, of the fault of the PATSY CHOTIN. See The Standella, 5 Cir., 1939, 108 F.2d 619.

The PATSY CHOTIN was several degrees (about 7°) to starboard of the GULFKNIGHT as the vessels closed. Its maneuvers after entering the Channel from the Canal, and her angled position well on the west edge of the Channel out of alignment with the Channel, required the GULFKNIGHT under the circumstances to sound passing signals which it failed to do. Though the head of the tow was swinging slowly, the stern was swinging faster and in a larger arc. Failure to sound such signals constituted a violation of paragraph 2 of Article 18, Rule I, of the Inland Rules,[2]

---

1. Article 25 reads in full as follows:
   In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel.

2. Article 18, Rule I, reads in full as follows:
   When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the

which requires passing signals when the vessels are meeting in such a manner as to involve "risk of collision." Cf. Parker Bros. & Co. v. DeForest, 5 Cir., 1955, 221 F.2d 377.

The GULFKNIGHT contends, however, that the vessels were on reciprocal courses and a starboard-to-starboard meeting with adequate clearance would have been made had the PATSY CHOTIN remained on course. In our view the vessels were not on parallel courses for the PATSY CHOTIN was already angling across the Channel from west to east, in clear view visually as well as by radar. Had the PATSY CHOTIN and the GULFKNIGHT reached a passing agreement as they closed, the accident would not have occurred. State Pilot PEARSON on board the GULFKNIGHT so testified, though other testimony by him is in conflict. The statutory violation by the GULFKNIGHT was, therefore, a major contributing fault in the ensuing collision.[3]

■ The GULFKNIGHT waited too long before taking action to avoid the collision. Its speed was not immoderate until it reached the area of the accident when its speed was too fast under the circumstances. It should have slowed its speed long before it ordered its engines stopped and reversed. At a speed of 7½ knots over the bottom the vessel can be stopped only within a distance of 1,250 feet in an estimated time of 2 minutes, 45 seconds. The PATSY CHOTIN was easily visible and obviously on the west edge of the Channel when it belonged in the east half of the Channel. Its heavy, cumbersome tow moved slowly across the Channel at an angle, and required several minutes for the head of the tow to reach mid-channel. We do not believe, therefore, that there was a sudden alteration of course across the Channel but that it was more of a gradual crossing. No reasonable explanation has been given by the GULFKNIGHT as to why its pilot and crew took so much time to realize the danger and risk of collision and take necessary action to stop and avoid the accident. Its slowness to react to danger and act accordingly is unaccountable. It is the duty of a vessel in the exercise of

other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other.

The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own and by night to cases in which each vessel is in such a position as to see both the sidelights of the other.

It does not apply by day to cases in which a vessel sees another ahead crossing her own course, or by night to cases where the red light of one vessel is opposed to the red light of the other, or where the green light of one vessel is opposed to the green light of the other, or where a red light without a green light or a green light without a red light, is seen ahead, or where both green and red lights are seen anywhere but ahead.

3. See also the Half-Mile Rule, 33 C.F.R. § 80.3, which is violated by failing to sound passing signals under the circumstances. The Rule reads in part as follows:

The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with the rules in this part, not only when meeting "head and head", or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port.

prudence and caution to stop its engines or timely reduce speed in the presence of danger or anticipated danger, otherwise it will be condemned for its failure to do so. A. H. Bull S. S. Co. v. Chesapeake S. S. Co., 4 Cir., 1939, 101 F.2d 599; Griffin on Collision, p. 86, § 35; Articles 27 and 29, Inland Rules.

The GULFKNIGHT's captain and pilot concede that they could not understand the course or intention of the PATSY CHOTIN but nevertheless they failed to give appropriate signal. This omission violated Article 18, Rule III, of the Inland Rules,[4] which requires the vessel in doubt immediately to signify by giving several short blasts, not less than four. The fact that the PATSY CHOTIN was plainly at fault does not excuse the GULFKNIGHT's failure to comply with the rule. See Tidewater Associated Oil Co. v. The Syosset, 3 Cir., 1953, 203 F.2d 264; General Seafoods Corp. v. J. S. Packard Dredging Co., 1 Cir., 1941, 120 F.2d 117. When a vessel fails to answer a passing signal, as the GULFKNIGHT did in this case, and waits too long before taking any action to avert collision, she cannot be exonerated from fault. Petition of Oskar Tiedemann & Co., 3 Cir., 1961, 289 F.2d 237. There is sufficient basis, therefore, for holding the GULFKNIGHT also at fault since she failed to reduce speed or stop her engines, without sounding the danger signal, though uncertain of the PATSY CHOTIN's intentions, and in the face of evident risk of collision. See A. H. Bull S. S. Co. v. The Exanthia, 2 Cir., 1956, 234 F.2d 650.

Interlocutory decree, therefore, will be entered declaring the mutual fault of both the PATSY CHOTIN and the GULFKNIGHT, and damages will be divided by the respective parties.

4. Article 18, Rule III, reads in full as follows:

    If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle.