TRIANGLE CEMENT CORP., as bareboat charterer and Hughes Bulk, Inc., as owner of the BARGE N. L. WALLACE, Plaintiffs,

v.

The TOWBOATS CINCINNATI and TURECAMO BOYS, their engines, boilers, etc.,

and

The Pennsylvania Railroad Company, D. T. B. Corp., Vincent C. Turecamo, Inc., B. Turecamo Towing Corp., and Turecamo Coastal & Harbor Towing Corp., Defendants.

No. 63 Ad. 1108.

United States District Court
S. D. New York.

July 5, 1967.

On Motion for New Trial Sept. 20, 1967.
On Settlement of Final Decree
Nov. 15, 1967.

Symmers, Fish & Warner, New York City, for plaintiffs; William Warner, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for defendants Pennsylvania R. Co. and D.T.B. Corp.; Kenneth H. Volk, New York City, of counsel.

Martin, Ryan & Reardon, New York City, for defendants Turecamo; Edward J. Ryan, New York City, of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BONSAL, District Judge.

In this admiralty action tried before the Court on May 24, 1967, plaintiffs Triangle Cement Corp. (Triangle) and

Hughes Bulk, Inc. (Hughes), seek to recover for damages to the barge N. L. WALLACE (the WALLACE) sustained as the result of a collision between the WALLACE and the towboat CINCINNATI (the CINCINNATI) while the WALLACE was being towed by the towboat TURECAMO BOYS (the TURECAMO) on the East River, Manhattan, New York, on April 12, 1963. The following constitutes the Court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

*Findings of Fact*

The WALLACE was 211.1 feet long, 42.9 feet wide, weighed 1,505 gross tons and had a depth of 15.5 feet, and on April 12, 1963 was owned by Hughes and was under bareboat charter to Triangle. The TURECAMO was owned by defendant Vincent C. Turecamo, Inc., and was operated by defendant Turecamo Coastal & Harbor Towing Corp.; the CINCINNATI was owned by defendant D.T.B. Corp., and was operated by defendant Pennsylvania Railroad Co.

On April 12, 1963 Turecamo Coastal & Harbor Towing Corp. received instructions from Triangle to tow the WALLACE from a pier at Huron Street, Greenpoint, Brooklyn to Ravena, New York, and at approximately 11 P.M. the TURECAMO took the WALLACE in tow, attaching a line from the starboard stern corner of the WALLACE to the stern of the TURECAMO. The TURECAMO towed the WALLACE out of the Brooklyn pier with the stern of the WALLACE pointing towards the Manhattan shore to a point on the East River between 800 and 1,000 feet from the Manhattan shore. The TURECAMO took in its line and navigated around the south or starboard side of the WALLACE to the bow of the barge for the purpose of putting on towing hawsers. The CINCINNATI was proceeding south down the East River at about 8–10 miles per hour and, while the WALLACE was without lines, the CINCINNATI collided at a 90 degree angle with the

north or port side of the WALLACE about 20 feet from her stern.

The TURECAMO was under the command of Louis Hermansen, second mate. The mate James Kiernan, two engineers, and the deckhands Thinsson and Strond, were on board. The WALLACE was unmanned when the TURECAMO took her in tow and she had no lights of her own. At Huron Street, before the WALLACE was pulled out of the pier, Hermansen gave Thinsson two 360 degree battery-powered lights and directed him to place them on the WALLACE. Thinsson placed one light on the starboard stern corner of the deckhouse and the other on the port stern corner. The lights were put on some lumber and a life ring was placed on top of the lumber around each light so that the lights were 2 to 3 inches above the top of the deckhouse and the globes of the lights were above the name board on the WALLACE. The lights were 12–14 inches high, the illuminated portion was about 4 inches, and up to the time of the collision, the lights were burning. Hermansen approved Thinsson's positioning of the lights and Thinsson returned to the TURECAMO and Strond went on board the WALLACE where he remained until the collision. On April 12, 1963 between 11 and 11:30 P.M. visibility was good, the weather was clear and the moon was out.

When the crew of the TURECAMO came to take the WALLACE in tow, the WALLACE had no forward mast or T-pole and Thinsson said in his deposition, dated January 6, 1964, that he could not find a place to put a light in the bow of the WALLACE and saw no reason to put one on the forward hatch cover, which he could have done. The after T-pole of the WALLACE was lying on her deck and Hermansen and Thinsson tried to raise it but neither could do so because of a tangle of wires. The WALLACE was last inspected by the United States Coast Guard on March 26, 1962 for amendment of a certificate of inspection to permit unmanned opera-

tion and no certificate of inspection was in effect on April 12, 1963.

The TURECAMO was carrying three white staff lights with the top light about 32 feet above her water line, and red and green running lights. Hermansen testified, in his deposition dated December 27, 1963, that as he was pulling the WALLACE out of the pier, he observed two tows on the East River, one going upstream and one going down, and that before taking the line off the stern of the WALLACE he looked for traffic on the river and saw none. Hermansen said that at this time he was on the upper deck aft of the TURECAMO and, since his view forward was obscured by the stack and pilothouse, he could not see 360 degrees unless he walked from side to side.

The CINCINNATI was being navigated by Captain Robarge, a tugboat master, and was proceeding south on the East River at ¾ speed—about 8 miles per hour—until she passed 40th Street. Walsh, a deckhand, who did not testify, was assigned as a lookout and was with Robarge in the pilothouse prior to and at the time of the collision. When the CINCINNATI passed 40th Street, Robarge increased her speed to full ahead and he said in his deposition of December 13, 1963 that he did not recall seeing any traffic on the river at that point. Robarge said that farther down the river—when the CINCINNATI was moving at between 8 and 10 miles per hour—he noticed three staff lights approximately 300 feet from the CINCINNATI and about 20 degrees off her port bow, indicating to him that there was a tug and tow ahead. The three staff lights were probably those of the TURECAMO which was navigating at or near the bow of the WALLACE. There was no evidence of any other tug being in the vicinity. Robarge did not reduce speed. He said he was looking for a tow when he suddenly observed the WALLACE loom up lying across stream about 150 feet in front of the CINCINNATI. Robarge then reversed his engines but took no helm action.

He estimated that the CINCINNATI was moving at about 3 knots when she struck the WALLACE.

Robarge testified that he did not see the TURECAMO until after the collision when she appeared from around the bow of the WALLACE, and that he didn't see any lights on the WALLACE until after the collision when he saw two lights on the stern outer corners of the deckhouse. The lights had been knocked down and were lying flat on the deckhouse, still lit. Robarge said the lights were not visible except from the stern of the WALLACE and that he did not see them until he circled around the barge. The pilothouse where Robarge was standing was 22 to 23 feet above the CINCINNATI's water line and as Robarge circled the WALLACE, he could look down on the barge.

After the collision, Robarge had a conversation with someone on the TURECAMO in which Robarge said he hadn't seen any lights on the WALLACE and the person from the TURECAMO replied that the lights had been knocked down. Robarge asked why the lights had not been higher, and received the reply that there was nothing higher to put them on.

*Conclusions of Law*

The CINCINNATI was negligent in connection with the collision and her negligence was a contributing cause of the collision. When Robarge saw three staff lights, indicating the presence of a tug and tow, the CINCINNATI should have taken some helm or engine action as a precautionary measure. See Marine Fuel Transfer Corp. v. The Ruth, 231 F.2d 319 (2d Cir. 1956); The Norne, 59 F.2d 145 (5th Cir. 1932). In addition, the crew of the CINCINNATI was negligent in not seeing the WALLACE until it was 150 feet ahead. See The Buenos Aires, 5 F.2d 425 (2d Cir. 1924); United States v. Holland, 151 F.Supp. 772 (D.C.Md.1957). The CINCINNATI relies on cases holding there is no duty to observe or avoid an unlighted or improperly lighted vessel. E.g., Bradshaw

v. The Virginia, 176 F.2d 526 (4th Cir.), cert. denied 338 U.S. 892, 70 S.Ct. 244, 94 L.Ed. 548 (1949); Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D.Pa.), aff'd per curiam, 295 F.2d 40 (3d Cir. 1961). In Bradshaw v. The Virginia, supra, lights indicating the presence of the vessel Greenwell, which was held solely at fault, had not been seen, whereas here, Robarge did see three staff lights 300 feet before helm or engine action was taken. In Reading Co. v. Pope & Talbot, Inc., supra, a ship collided on a dark night with an unlighted and unmarked wreck 250 feet long and 39 feet wide that was partially submerged. The captain of the ship, held to be without fault, saw the wreck 200 feet before the collision but could not avoid it. Here, the CINCINNATI could have slowed down so that when she observed the WALLACE 150 feet away she could have taken helm action to avoid the collision.

■ The TURECAMO was negligent in connection with the collision and her negligence was also a contributing cause. The WALLACE was improperly lighted at the time of the collision since she did not have a proper light on her bow (see 33 C.F.R. § 80.17(b) (1), (6)). Had she carried one, it would have been visible to Robarge when he was looking to the port side of the CINCINNATI where he observed the three staff lights. The TURECAMO was responsible for placing the proper lights on the WALLACE which had no crew of its own (see, e.g., Boston Metals Co. v. The Winding Gulf, 209 F.2d 410 (4th Cir. 1954), reversed on other grounds, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955); The Lizzie M. Walker, 3 F.2d 921 (4th Cir. 1925)), and the TURECAMO cannot excuse her negligence on the ground that the WALLACE did not have a bow T-pole. This condition was obvious to the crew of the TURECAMO and the TURECAMO could have refused to take the WALLACE in tow.

The WALLACE was not seaworthy since she was not equipped to carry the lights required under 33 C.F.R. § 80.17(b) (1), (6), and her unseaworthiness was a contributing cause of the collision. The WALLACE should have been equipped so as to be able to carry bow and stern lights "above the * * * deck house" that would have shown "an unbroken light all around the horizon, * * * of such a character as to be visible * * * at a distance of at least 2 miles." Since she did not have a bow T-pole and her stern T-pole could not be raised, the WALLACE was not so equipped. Hence, the WALLACE cannot recover her damages in full. See Southgate v. Eastern Transportation Co., 21 F.2d 47 (4th Cir. 1927); Frederick Snare Corp. v. Moran Towing & Transportation Co., 195 F.Supp. 639 (S.D. N.Y.1961); United States v. Holland, supra. Cf. The Lyndhurst, 92 F. 681 (S.D.N.Y.1899); The Nettie L. Tice, 110 F. 461 (E.D.N.Y.1901).

■ Since the CINCINNATI and the TURECAMO were negligent and the WALLACE was unseaworthy, damages will be divided among them equally. See, The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600 (1909); Horton & Horton, Inc. v. The Robert E. Hopkins, 269 F.2d 914 (5th Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960); United States v. Holland, supra; cf. Pennsylvania Railroad Co. v. The Beatrice, 275 F.2d 209 (2d Cir. 1960).

A hearing may be noticed by any party to determine the damages, unless the parties stipulate that some exceptional condition requires the appointment of a Commissioner (Rule 53(b) F.R.Civ.P.). In such event, the parties will be invited to agree on a Commissioner, and to submit his name for the Court's approval, or if the parties are unable to agree, the Court will appoint a Commissioner.

Settle interlocutory decree in accordance with the foregoing.

It is so ordered.

## On Motion for New Trial

Plaintiffs move for a new trial (Rule 59(a) (2) F.R.Civ.P.) on the ground

that the court erred in finding the WALLACE unseaworthy, or, if she was, in finding that her unseaworthiness was a contributing cause of the collision. The court found that the WALLACE was unseaworthy since she was not equipped to carry the lights required under 33 C.F.R. § 80.17(b) (1), (6), and that her unseaworthiness was a contributing cause of the collision. Plaintiffs contend in this motion that the WALLACE was not unseaworthy since under 33 C.F.R. § 80.17(b) (1), (6) she was not required to be equipped with bow and stern T-poles, and, alternatively, that even if the WALLACE was unseaworthy, the unseaworthiness was obvious to the crew of the TURECAMO who placed lights on the stern of the WALLACE, and by taking the WALLACE out at night into the East River notwithstanding the unseaworthiness, the TURECAMO was negligent and it was her negligence together with the negligence of the CINCINNATI that caused the collision.

■ The court found, and amends its Findings of Fact accordingly (Rule 59 (a), F.R.Civ.P.), that plaintiff Triangle directed the operator of the TURECAMO, Turecamo Coastal & Harbor Towing Corp., to take the WALLACE out on the night in question; that had the WALLACE been equipped with a bow T-pole and had it been possible to raise her stern T-pole, the crew of the TURECAMO would have placed bow and stern lights on the T-poles; that the lights on the deckhouse did not show "an unbroken light all around the horizon, * * * visible * * * at a distance of at least 2 miles" as required under 33 C.F.R. § 80.17(b) (6); and that a light on the forward hatch cover, which was approximately the same height as the deckhouse, would not have shown such a light. Although the WAL-LACE was not required to carry bow and stern T-poles under 33 C.F.R. § 80.17 (b) (1), (6), the WALLACE was required to carry the specified lights, and since she was not equipped to do so, the court found she was unseaworthy.

In holding the WALLACE as well as the tugs CINCINNATI and TURECAMO responsible for the collision, there was no shifting of responsibility for the negligence of the TURECAMO to "its innocent tow." In view of Triangle's direction to the operator of the TURECAMO to take the WALLACE out at night, plaintiffs cannot avoid liability on the ground that the WALLACE's unseaworthiness should have been obvious to the crew of the TURECAMO.

The interlocutory judgment noticed for settlement on July 14, 1967 has been signed and filed. Plaintiffs' motion for a new trial is denied.

It is so ordered.

### On Settlement of Final Decree

In signing the "final decree" submitted by attorneys for The Pennsylvania Railroad Co. and D. T. B. Corp., the court, in the exercise of its discretion, has denied plaintiffs' application for interest from April 12, 1963, the date of the collision. While the WALLACE was the only vessel to sustain damage, she was at fault in not being equipped to carry the proper lights. Had she been so equipped, there is no reason to believe that the collision would have occurred. The negligence on the part of the CINCINNATI and the TURECAMO does not provide a sufficient basis for departing from the usual rule that interest commences to run from the date of the final decree. Lady Nelson, Ltd. v. Creole Petroleum Corp., 286 F.2d 684 (2d Cir. 1961); Afran Transport Co. v. Bergchief, 285 F.2d 119 (2d Cir. 1960).