INSURANCE COMPANY OF
NORTH AMERICA

v.

JOHN J. BORDLEE CONTRACTORS,
INC.

ATLANTIC MARINE TRANSPORT
CORP.

v.

JOHN J. BORDLEE CONTRACTORS,
INC. et al.

BOARD OF COMMISSIONERS OF the
PORT OF NEW ORLEANS

v.

M/T PINA, et al.

AMERICAN COMMERCIAL
BARGE LINES, INC.

v.

M/T PINA, et al.

In the Matter of AMERICAN COMMER-
CIAL BARGE LINES, as Charterers
of the BARGE ACBL 2666.

In the Matter of JOHN J. BORDLEE
CONTRACTORS, INC., as Owner of
the M/V MR. PETE.

VAN REEKUM PAPER COMPANY

v.

AMERICAN COMMERCIAL BARGE
LINES, INC. et al.

Civ. A. Nos. 80–754, 80–892, 80–1138, 80–
2197, 80–2219, 80–2276 and 80–4776.

United States District Court,
E. D. Louisiana.

Feb. 18, 1982.

Donald A. Hoffman and Robert I. Siegel of Camp, Carmouche, Palmer, Barsh & Hunter, New Orleans, La., for Ins. Co. of North America and Allstate Ins. Co.

George W. Healy, III and Clayton G. Ramsey of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Atlantic Marine Transport, Inc.

Robert M. Contois, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for American Commercial Barge Lines.

Nigel E. Rafferty of Monroe & Lemann, New Orleans, La., for Southern American Ins. Co.

James A. Cobb, Jr. of Law Offices of Francis Emmett, New Orleans, La., for St. Paul Fire & Marine Ins. Co.

J. Y. Gilmore, Jr. of Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for Underwriters at Lloyd's.

Cliffe E. Laborde and Gerard T. Gelpi of Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., for John J. Bordlee & John J. Bordlee Contractors.

Thomas J. Grace of Courtenay, Forstall & Grace, New Orleans, La., for Twin City Barge Line.

Joseph P. Tynan of Burke & Mayer, New Orleans, La., for Bd. of Commissioners of Port of New Orleans.

Ralph E. Smith of Deutsch, Kerrigan & Stiles, New Orleans, La., for Van Reekum Paper Co.

Rufus Harris, III of Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for Ins. Co. of North America.

Richard B. Foster and Bettye A. Barrios of Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for Coscol Petroleum Corp.

CHARLES SCHWARTZ, Jr., District Judge.

These consolidated matters arise from a marine collision in the Mississippi River at New Orleans on the night of December 19, 1979. Following trial to the Court sitting without a jury, the cases were submitted for further briefing by the parties and further study by the Court. Now, having carefully considered the record herein, the memoranda of counsel, and the applicable law, the Court rules as follows.

To the extent that any of the following findings of fact constitute conclusions of law they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## THE COLLISION

*Findings of fact:*

At approximately 9:00 P.M. C.S.T. (2100 hours) on the night of December 19, 1979, the M/T PINA and the ACBL 2666, the lead barge in the tow of the M/V MR. PETE, came into collision in the Lower Mississippi River at approximately Mile 99.5 Above Head of Passes, at a point roughly abreast of the Napoleon Avenue Wharf at New Orleans.

The M/T PINA is a Liberian tankship owned and operated by Atlantic Marine Transport Corporation, Inc. At the time of collision the PINA was upbound in the Mississippi enroute from the Belle Chasse Anchorage to Good Hope, Louisiana for the purpose of discharging a cargo consisting of some 60,000 barrels of light Arabian crude oil. The PINA was under the command of its master, Carlo Vibaldi. Piloting the vessel was Reuel Reichert, a member of the New Orleans-Baton Rouge Steamship Pilots Association. Also on the bridge at collision were Third Mate Antonio Maresca and Helmsman Abdelhamid Amri. The PINA had no bow lookout posted and an anchor watch posted at the request of the pilot while navigating Algiers Point had been relieved prior to collision.

The M/V MR. PETE is a pushboat owned and operated by John J. Bordlee Contractors, Inc. (Bordlee). At the time of collision the MR. PETE was downbound in the river enroute from the American Commercial Barge Lines Fleet at Harahan, Louisiana, to the Poydras Street Wharf for the purpose of delivering its lead barge the ACBL 2666. The tow of the MR. PETE consisted of two barges, the ACBL 2666 and the ACBL 1742. Both barges were owned by American Commercial Lines, Inc. (ACL) and bareboat chartered to American Commercial Barge

Line Company (ACBL). The ACBL 2666 carried a load of Kraft Liner Board owned by Van Reekum Paper Company and the ACBL 1742 carried a cargo of coke. The MR. PETE was pushing its tow in rigid tandem with the ACBL 1742 faced up to the pushboat and the ACBL 2666 in the lead. The crew of the MR. PETE consisted of its captain, Charles Newell, and deckhand Barry Poyadou. Although Newell had worked on Mississippi River towboats for some seven years, he possessed no Coast Guard license of any kind. Mr. Poyadou had no Coast Guard license.

The night of the casualty was clear with no adverse weather conditions of any kind and visibility was unrestricted. In the vicinity of collision the river is relatively straight and approximately 2000–2700 feet wide. Shoreside installations in the area include the Napoleon Avenue Wharf owned by the Board of Commissioners of the Port of New Orleans on the east or left descending bank and the Emar Fleet (popularly known as the Public Grain Elevator Fleet) and the Texaco dock on the west or right descending bank.

The PINA and the MR. PETE were both equipped with fully functional radar and VHF–FM radios. The ship's radio was set on Channel 11 and her pilot carried a hand set tuned to Channel 67. The radios on the MR. PETE were set to monitor traffic on Channel 67 with Channel 66 being utilized for purposes of communication with its dispatcher at South Stream Marine, Inc.

The PINA and the MR. PETE were properly lit in all respects. The PINA displayed a white stern light, red and green sidelights on the port and starboard, a white masthead light and a white range light. The MR. PETE displayed a white stern light, red and green sidelights, and two white lights on the masthead signifying a vessel towing.

The bow of the lead barge ACBL 2666 carried a red light on the port, a green light on the starboard, and a flashing amber light in the middle. These were portable lights composed of a 6-volt battery to which was attached a flashlight bulb and a colored plastic lens. The lights were placed on the ACBL 2666 by Bordlee Captain Kenneth Pichoff and an unidentified deckhand after they had made up the tow of the MR. PETE at the ACBL facility prior to the departure of the tow from Harahan. They were the type of light customarily utilized by Bordlee on the barges in the tow of its vessels. Testing of similar lights during the course of the Coast Guard investigation into the casualty revealed a luminous range of 0.56 nautical miles for the red sidelight, 0.71 nautical miles for the green sidelight, and 0.57 nautical miles for the amber light. According to crew members of the tug SHANE C who observed the collision from that vessel, the lights on the ACBL 2666 just prior to collision were so dim as to be visible at best 200–300 feet away.

The MR. PETE had been dispatched to ACBL by South Stream Marine, Inc., a towing broker which had been contacted by ACBL to arrange for the towage. Pichoff, licensed by the Coast Guard to operate uninspected vessels on inland and western rivers, was working a 6:00 A.M. to 6:00 P.M. shift. He made up the tow and placed the lights prior to the end of his shift. Upon the arrival of Newell who worked 6:00 P.M. to 6:00 A.M., Pichoff left the vessel. At approximately 8:00 P.M. Newell and Poyadou departed ACBL. Prior to departure Poyadou checked the barge lights and found them to be operational.

According to Newell, he proceeded downriver at slow or idle speed which he estimated to be approximately 4–5 m. p. h. and this speed was maintained until collision was imminent. After negotiating Greenville Bend (approximately Mile 101), Newell angled his tow so as to attain a course parallel to the east bank of the river. His stated reason for favoring the east bank was to avoid current on the west bank in light of river conditions as he perceived them. Newell testified that he first sighted the PINA approximately 2½–3 miles ahead at an estimated 7 minutes prior to collision. His initial sighting was of the ship's range lights and the green side light about 10 degrees off his starboard bow. Newell an-

ticipated that the two vessels would pass starboard to starboard despite the fact that it was more usual to pass to port in that area of the river and he himself did so approximately 60% of the time or in all cases except when river conditions dictated otherwise.

According to Newell, he tried repeatedly to raise the PINA by radio without success, his final attempt being made when the vessels were about one-half mile apart. That Newell attempted radio contact with the PINA on Channel 67 is verified by New Orleans Vessel Traffic Center (VTS) tapes of transmissions that evening. At about the time of his last radio call, Newell stated that he began to see the PINA's red sidelight and he perceived that the oncoming vessel was cutting in front of him. He testified that he sounded two whistles at this point and shined a light on his barges to alert the ship to the presence of the tow. He then attempted to avoid collision by topping around by means of a maneuver he referred to as "twin-screwing" whereby he intended to turn the head of his tow to port by putting his port engine in full reverse and his starboard engine in full forward with a hard left rudder. He intended to turn his bow to port into the current to slow his forward momentum, then back away from the PINA. According to Newell, he had achieved aft motion just prior to collision and was headed slightly upriver with the current just about on his port beam.

Both Newell and Poyadou testified that as Newell attempted to top around, Poyadou sounded several whistle blasts. However, no whistle signals from either vessel were heard by any other witness to the casualty.

At approximately 8:15 P.M. Reichert boarded the PINA just below Algiers Point. He put the vessel at full ahead maneuvering speed of about 10–12 knots and this speed was maintained until impact.

As he proceeded upriver Reichert made several calls to check for traffic. As he approached the Harvey Canal forebay at 8:53 he was advised by VTS that he would meet several vessels including a southbound tow identified as the MR. PETE. This information was based upon an 8:45 P.M. call from Newell in which he advised that he was coming down on the Public Grain docks.

Reichert visually sighted the MR. PETE approximately 2–2½ miles ahead off his port bow. He perceived that the MR. PETE was on a course paralleling the west bank of the river. Under such circumstances Reichert assumed that the vessels would pass port to port. At the time of his first sighting of the MR. PETE, Reichert was proceeding just to the east of the midline of the river and he angled his vessel slightly (about 10 degrees) to starboard to advise the oncoming vessel that he anticipated a one whistle passing.

Reichert testified that he first sighted the red side light of the MR. PETE. Also visible were two white towing lights. However, despite this fact Reichert believed that the MR. PETE was light boat. His impression in this regard stemmed from the fact that he observed no lights on the tow and from his knowledge that it was not unusual for tugs crossing the river enroute to and from the fleeting areas on the adjacent bank to cross light boat without extinguishing their towing lights.

Although the radar on the PINA's bridge was fully operational, it was not being continually monitored by anyone and the pilot did not refer to the radar screen after doing so below Algiers Point. Both Reichert and Vibaldi were of the impression that there was no need to consult the radar screen when the visibility was clear as it was on that night. However, Reichert testified that reference to the radar would have apprised him of whether or not the MR. PETE had a tow.

According to Reichert, after sighting the MR. PETE, he tried repeatedly to make contact on his hand set which was tuned to Channel 67. He never called the MR. PETE by name although advised of it by VTS and instead directed his communications to the "southbound tow." Captain Vibaldi also testified that repeated calls

were made by Reichert. However, the transmissions are not recorded on the VTS tapes of the evening of collision.

Reichert and Vibaldi testified that as the MR. PETE approached they saw the green side light from time to time signifying a slightly zig-zag course. As the two vessels approached Reichert stated that he began seeing the green light more and more which indicated to him that the MR. PETE was turning toward his vessel. Captain Vibaldi testified that he only saw the green light a little while always viewing the red.

Still proceeding full ahead, the pilot put his rudder hard to starboard about 30 seconds before collision. Then just prior to impact he sighted the barges in the tow of the MR. PETE and ordered the rudder hard to port. Seconds later the port bow of the PINA came into collision with the bow of the ACBL 2666. The collision caused a gash in the port side of the PINA beginning about 30 feet aft of the bow and measuring approximately 60 feet in length and 12 feet in height spilling oil from the ship which ignited immediately, creating a fire which enveloped the port side of the PINA and spread across the river surface. The fire and heavy smoke generated by it necessitated an abandon ship order from the master.

After collision Reichert ordered the PINA's engines full astern. The ship was swinging to port and heading toward the west bank. The pilot ordered the rudder hard to starboard, but before the vessel's swing was checked, the PINA collided with the barge ACO–121B which was the outermost barge in a tier of barges moored at the Emar Fleet. The ACO–121B, owned *pro hac vice* by Twin City Barge and Towing Company, was laden with spring wheat and caught fire after being struck by the PINA.

After striking the ACO–121B the PINA began to respond to the right rudder command and swung back toward the center of the river. Three minutes after the full astern order the engines were stopped and the rudder put amidships. With the aid of rescuing tugs the PINA was moored at the Napoleon Avenue Wharf where firefighting efforts were undertaken by the New Orleans Fire Department, and the fire boats M/V DELUGE and M/V BOURGEOIS. There was damage sustained to the wharf as the result of the casualty.

The impact of collision broke the ACBL 2666 loose from the tow and it drifted downriver in flames. It was picked up by the M/V FORT PIKE and taken to the Harmony Street Wharf where the fire was extinguished.

Although the ACBL 1742 was not on fire, the crew of the MR. PETE broke the face barge loose. It drifted downstream and was picked up by the M/V CINDY COLE and taken to the Napoleon Avenue Wharf.

After breaking free from the ACBL 1742, Newell and Poyadou retreated from the scene. They moored the MR. PETE at the Texaco dock, secured it with one line and left with doors open, lights burning and engines running. According to Newell and Poyadou, they made an attempt to reach Mr. John Bordlee, Sr. by telephone but the line was engaged. They then took a taxi to Poyadou's home where they picked up a vehicle and drove to Newell's home in Angie, Louisiana, arriving there at approximately 1:00 A.M.

Mr. Bordlee, Sr. was notified of the collision by the dispatcher from South Stream Marine. He called his son, John, Jr., and together they proceeded to the Texaco dock where they found their abandoned vessel. After unsuccessful efforts at locating the crew in the vicinity, John, Jr. located Kenneth Pichoff at home and requested that he come down to the boat. When Pichoff arrived the Bordlees discovered for the first time that he had left the vessel before it departed the ACBL facility and had not been aboard at the time of the casualty.

Although Mr. Bordlee believed, due to Newell's representations to him at the time of hiring, that Newell was licensed by the Coast Guard, he had been aware since June, 1979, that Newell was in fact unlicensed.

At the time of the casualty Bordlee had a total of three captains on rotation for the MR. PETE. Of the three, only Kenneth

Pichoff possessed a Coast Guard license. The captains operated on a rotation schedule whereby each captain would work two weeks on and one week off the vessel. This created a situation in which one out of every three weeks—when Pichoff was off—the MR. PETE was under the control of two unlicensed captains. Even when Pichoff was aboard, there were times when he was off watch and out of the wheelhouse or not on board, and at such times the vessel was under the control of unlicensed personnel.

*Conclusions of Law:*

The Court has jurisdiction herein pursuant to 28 U.S.C. § 1333.

■ The Navigational Rules for Harbors, Rivers, and Inland Waters (hereinafter the Inland Rules), 33 U.S.C. § 151 *et seq.* are applicable to this collision which took place in the Mississippi River below the Huey P. Long Bridge. 33 U.S.C. § 154.

■ Our careful analysis of the facts attendant to this accident and the application of the Inland Rules to the facts as we find them compel the conclusion that this casualty could not have occurred absent fault on the part of both the PINA and the MR. PETE. These two vessels collided in a relatively straight stretch of the river in which there was adequate room for safe passage and in the absence of any adverse weather conditions. Both had operational radar and radio. Neither vessel was faced with any mechanical malfunction. We believe that the vessels could and should have passed without incident. Obviously they did not, and we have directed our inquiry to ascertaining the reasons for that failure. The Court's conclusion, succinctly stated, is that this collision resulted from a total failure of communication and a complete disregard of the dangers posed by such failure on the part of both vessels.

The PINA sighted the MR. PETE visually and allegedly attempted to contact the oncoming vessel by radio without success. The pilot assumed that the vessels would pass to port. However, he never reached any agreement in that regard from the MR.

PETE. Failing radio contact he sounded no whistle signals. The situation was further compounded by the fact that, despite lights on the MR. PETE indicating a vessel towing, Reichert proceeded under his own assumption that the vessel was light. At no time did he or any of the ship's crew consult the PINA's radar to ascertain whether or not the MR. PETE did in fact have a tow. At no time was there any slackening of the PINA's speed as she approached collision.

The MR. PETE was similarly at fault. After unsuccessfully attempting to reach the PINA by radio, Newell assumed that the vessels would pass on two whistles which he knew was not the usual passage in that stretch of the river. Unable to achieve radio communication, he sounded no whistle signals and proceeded on his own chosen course until collision was imminent.

Specifically the Court finds the following faults on the part of the PINA and the MR. PETE:

1. Both vessels were in violation of Art. 18 (Rules I and III) of the Inland Rules, 33 U.S.C. § 203.

■ It is impossible to reconcile the testimony of Reichert and Newell with respect to the courses of the two vessels as they approached each other. Each perceived that the vessels were on parallel courses, however, Reichert believed that the vessels were approaching port to port and Newell felt that the approach was starboard to starboard. The Court can only conclude from all the evidence that the vessels were in fact meeting end on or nearly so in such a manner as to involve risk of collision. Under such circumstances, Art. 18 (33 U.S.C. § 203), requires that the vessels pass to port following a one whistle blast by either vessel to signify such intent.

In the instant case Reichert properly anticipated a port to port passage. However, he never signaled this intention by whistle signal or otherwise. Newell was clearly unjustified in assuming a starboard to starboard passage without any specific agreement from the PINA in that regard.

It is clear that each vessel approached collision unsure of the course and intention of the other, yet neither sounded the whistle signals required under such circumstances by Art. 18 (Rule III) (33 U.S.C. § 203).

In summary, it is the Court's opinion that these two vessels should have passed each other to port. Both vessels neglected to reach any agreement as to their passage or to sound any danger signal in the absence of agreement. 33 U.S.C. § 203; *Chotin, Inc. v. S. S. Gulfknight*, 266 F.Supp. 859 (E.D.La., 1966) *aff'd* 402 F.2d 293 (5th Cir., 1968); *Chester A. Poling, Inc. v. United States*, 55 F.2d 921 (2nd Cir., 1932).

2. One of the causes of the collision was the failure of the PINA to appreciate the fact that the oncoming MR. PETE was pushing a tow. This misapprehension is the fault of both parties.

The lights on the head of the tow of the MR. PETE were not visible for at least two miles and were accordingly in violation of 33 C.F.R. § 80.16a(b), (i), (j). Full responsibility for such insufficient lighting is that of Bordlee. The ACBL barges in the tow of the MR. PETE were unmanned and fully under the control of the towboat. The evidence is clear that the crew of the MR. PETE was responsible for and did place the lights on the tow. There is no evidence in the record that the barges presented to Bordlee for towing were not fully seaworthy in all respects. Specifically, there is no evidence that the type of lights utilized by Bordlee resulted in any way from the construction or condition of the ACBL barges but rather was the usual and customary manner of lighting tows used by the Bordlee employees. *See, Triangle Cement Corp. v. Towboat Cincinnati*, 280 F.Supp. 73, 76 (S.D.N.Y.1967) *aff'd* 393 F.2d 936 (2nd Cir. 1968).

However, despite the fact that the barges in the tow of the MR. PETE were not visible to those on the bridge of the PINA, the PINA was not justified in proceeding as if the MR. PETE were light boat. Upon sighting the towing lights properly displayed on the MR. PETE, the PINA should have undertaken to ascertain whether or not there was a tow. *Triangle Cement Corp. v. Towboat Cincinnati, supra* at 280 F.Supp. 75–76. According to the testimony of both Vibaldi and Reichert, the truth could easily have been determined by reference to the radar screen on the bridge. However, no attempt to verify the status of the MR. PETE was made by any of the PINA's bridge personnel. This failure is rendered more egregious by the fact that the PINA had been advised by VTS that she would be meeting a southbound tow. We hold that the failure to proceed in conformity with proper lighting displayed by the MR. PETE and/or the failure to ascertain the presence of the tow was clearly imprudent and in violation of Art. 29 of the Inland Rules, 33 U.S.C. § 221.

We note but do not accept the testimony of pilot Reichert to the effect that he would have proceeded in the same manner whether or not the MR. PETE had a tow. That statement may well be correct with respect to the fact that he would have attempted a port to port passage regardless of the presence or absence of a tow, however, we simply cannot accept the fact that, had he been aware of the tow, he would not have perceived the danger of collision at a point earlier in time when collision might still have been averted.

3. We hold that the PINA was in violation of the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. § 1201 *et seq.* which requires at § 1204 that all vessels in navigation maintain a listening watch. *See, Allied Chemical Corporation v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1054 (5th Cir. 1981).

In this case the radios aboard each vessel were fully operational. We further believe that the evidence supports the conclusion that each vessel attempted to contact the other on Channel 67.

The VTS tapes support Newell's testimony to the effect that he attempted to call the PINA. We can only conclude that the PINA did not hear these calls as the result of the failure to maintain a proper listening watch as mandated by 33 U.S.C. § 1204 and we so hold. The failure to properly monitor

the radio is especially significant in this case in that it is apparent that the PINA was relying solely on radio contact rather than whistle signals for the purpose of confecting a passing agreement.

While it is clear that the MR. PETE also relied solely on radio as a means of contacting the approaching vessel, we cannot charge that vessel with a violation of the law in connection with the maintenance of a radio watch. Newell was making his position known and was attempting to contact the PINA. The evidence in the record gives no satisfactory explanation as to why the radio calls of the PINA's pilot were not properly broadcast. But the fact is that for some reason they were not transmitted and could not have been heard by the MR. PETE.

4. Under the circumstances the Court is of the opinion that the PINA was proceeding at an excessive rate of speed. There is no evidence in the record to justify the conclusion that the vessel could not have maintained maneuverability at a lesser rate of speed. However, without slowing from full ahead, she proceeded toward an oncoming vessel which might or might not be pushing a tow and which she could not contact by radio. We hold that the PINA's speed contributed to the ultimate outcome.

5. The failure of the MR. PETE to have licensed personnel on board contributed to the collision. The record contains no sufficient explanation as to why, contrary to custom in the area, Mr. Newell chose to proceed downbound favoring the east or left descending bank rather than the west or right descending one. We hold that he should have proceeded to the right of the midline of the river downbound thereby placing his flotilla in proper position for an uncomplicated port to port passing with the upbound PINA. The Court is further of the opinion that the evasive maneuver chosen by Newell just prior to collision actually served to turn his vessel into the PINA and aggravated rather than mitigated the situation.

The failure of the MR. PETE to have licensed personnel aboard was in violation of 46 U.S.C. § 405 which provides in pertinent part:

"An uninspected towing vessel in order to assure safe navigation shall, while underway, be under the actual direction and control of a person licensed by the Secretary [of the department in which the Coast Guard is operating] to operate in the particular geographic area and by type of vessel under regulations prescribed by him ...."

█ Bordlee cites as authority for the proposition that violation of a licensing statute does not support application of the Pennsylvania Rule.[1] *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). The rationale for this position is that possession of a license is merely a condition which may or may not reflect actual navigational skill and that the rule should be applicable only as to statutes which mandate actual navigational duties. See, Griffin, *The American Law of Collision*, § 254, p. 578–579. We are not convinced.

█ A statutory violation giving rise to application of the Pennsylvania Rule must involve failure to comply with a statute intended to prevent collision. Section 405 of Title 46 itself provides that licensed personnel are required, "... in order to assure safe navigation." The requirement is mandatory rather than discretionary. See, *Afran Transport Co. v. United States*, 435 F.2d 213 (2nd Cir., 1970) *cert. den'd* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). Noting that the Pennsylvania Rule's purpose is to insure compliance with statutory commands and that it does not impose lia-

1. The Rule of *The Pennsylvania* provides that when a ship violates a statutory rule intended to prevent collision, "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." *The Pennsylvania, supra.* This rule retains full validity having been unaffected by *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). *Atlantic Mutual Insurance Company v. ABC Insurance Company*, 645 F.2d 528 (5th Cir. 1981).

bility but merely shifts the burden to the offending vessel, the Court is of the opinion that the better view is that the rule is applicable to a vessel in violation of 46 U.S.C. § 405 as was the MR. PETE in the instant case. *See, The Eagle Wing*, 135 F. 826 (E.D.Va.1905); *The City of Baltimore*, 282 F. 490 (4th Cir., 1922); *Martin Marine Transportation Co. v. United States*, 183 F.2d 676 (4th Cir., 1940).

In the instant case the evidence is clear that Newell's navigation of the MR. PETE provided a contributing cause of the collision. The evidence further fails to negate the possibility that, had Newell possessed the expertise necessary to obtain a Coast Guard license, he might not have committed the navigational errors which contributed to the happening of this casualty.

The foregoing faults are in the opinion of the Court the contributing causes of the collision herein. We do not find that the absence of a lookout on either vessel contributed to the accident in that each vessel saw the other prior to collision but misapprehended its true course and position. Whether or not a bow lookout might have sighted the tow of the MR. PETE visually before it was sighted on the bridge is of no moment in light of our holding that the PINA was obligated to proceed under the assumption that the MR. PETE was towing due to the lights on the towboat itself which signified that fact.

We further do not find that the record in this case supports any conclusion as to the condition of the crew of the MR. PETE as the result of drugs and/or alcohol and, accordingly, we do not make one.

Finally, the record supports the conclusion that following collision the pilot and crew of the PINA skillfully maneuvered the burning vessel so as to avoid greater damage to vessels and dock facilities in the area. The performance of the crew of the MR. PETE was inexcusable. However, we find that the response of the MR. PETE following collision did not serve to increase or enhance the damage sustained by any party.

As previously noted, this is a case of mutual fault, and liability for it must be apportioned in accordance with *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In light of the foregoing, the Court finds that the collision forming the basis of these consolidated actions resulted 50% from the fault of the PINA and 50% from the fault of the MR. PETE and damages should be apportioned accordingly. We further find ACL and ACBL free from fault in connection with the happening of this collision and are therefore entitled to exoneration from all liability. 46 U.S.C. § 183; *see also, Tittle v. Aldacosta*, 544 F.2d 752, 755 (5th Cir., 1977).

### THE HULL INSURANCE

On August 28, 1979, Insurance Company of North America and Allstate Insurance Company (INA and Allstate) issued policy No. AMW 1273 to Bordlee through its agents Corroon and Black. This policy afforded hull coverage to the MR. PETE and provided at lines 132–134 that:

> The underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercise due diligence to maintain the Vessel in a seaworthy condition after attachment of this policy; the foregoing however, not to be deemed a waiver of any warranty of seaworthiness implied by law.

On December 20, 1979, the day following the collision between the MR. PETE and the PINA, John Bordlee, Sr. retained counsel to represent him in connection with the casualty. On that same day INA and Allstate retained counsel to represent Bordlee as well as INA and Allstate as underwriters. When the Coast Guard inquiry into the casualty began on December 21, 1979, both counsel retained by Bordlee personally and counsel retained by INA and Allstate appeared and both participated throughout the course of the hearings which concluded on January 7, 1980.

On December 21, 1979, all counsel and Mr. Bordlee, Sr. met at Bordlee's attorneys' offices where they interviewed Newell and

Poyadou. At this time it was discovered that neither Newell nor Poyadou possessed a Coast Guard license.

On January 4, 1980, Mr. Bordlee, Sr. testified at the Coast Guard hearing to the effect that he had known of Newell's lack of license and of the fact that his rotation schedule allowed the MR. PETE to be on regular occasions under the control of unlicensed personnel. This testimony was the first knowledge that insurers' counsel had of these facts.

On January 22, 1980 insurers' counsel recommended to his clients that coverage be denied. Insurers sent a reservation of rights letter to Bordlee on that date.

Thereafter, on February 29, 1980, insurers issued an endorsement voiding the policy as of August 28, 1979.

Prior to the December 19, 1979 casualty and the actions of INA and Allstate in declining coverage in January and February, 1980, Bordlee had made a claim on the hull policy arising out of an incident on August 31, 1979. The claim was paid by the insurers with checks in payment of it being forwarded to Bordlee on November 5, 1979 and January 23, 1980.

INA and Allstate initially took the position that the previously quoted clause in the policy constituted an express warranty, violation of which voided the policy *ab initio*. We disagreed and in ruling on cross motions for summary judgment filed by the insurers and Bordlee held that the clause constituted an exclusion or limitation on coverage which would support a denial of liability in the event that the loss or damage be caused proximately by the failure of the assured to use due diligence to maintain the vessel in a seaworthy condition. (See Court's Opinion dated February 11, 1981 at 507 · F.Supp. 845).

At the outset we note that, having found that the policy was not void *ab initio*, we need not address the issue of whether or not INA and Allstate sufficiently effected cancellation by means of return of premium and notification of additional assureds. We hold that the policy was in effect on the date of the casualty. Next we must address the question of whether or not under the circumstances here present the hull policy provided coverage. In light of the facts in this case and construing them in the light most favorable to coverage, we are compelled to hold that the exclusion is applicable and Policy AMW 1273 does not afford coverage for this casualty.

We have previously held that the exclusion in this case expressly states the implied warranty of seaworthiness which exists in American hull policies. In connection with such a warranty the Court in *Lemar Towing Inc. v. Fireman's Fund Insurance Co.*, 352 F.Supp. 652 (E.D.La.1972) *aff'd* 471 F.2d 609 (5th Cir. 1973) *cert den'd* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973) stated:

> To escape liability by way of this contention the underwriter must prove that the shipowner had knowledge of this unseaworthy condition, if in fact it did exist, and that said condition was the proximate cause of this loss. *Lemar Towing Inc. v. Fireman's Fund Insurance Co.*, *supra* at 352 F.Supp. 660.

Stated otherwise the burden is on the insurer to prove that the shipowner acted out of bad faith or neglect by knowingly permitting the vessel to sail in an unseaworthy condition. *Texaco Inc. v. Universal Marine Inc.*, 400 F.Supp. 311 (E.D.La.1975).

In this case whether we apply the term due diligence (as stated in the exclusion in this case) or knowledge (*Lemar*) or bad faith or neglect (*Texaco, Inc. v. Universal Marine*) the result is the same. Mr. Bordlee knew that Mr. Newell was unlicensed and he knew that his rotation allowed for a completely unlicensed crew on occasion and he knew that this was in violation of law.

In making our determination that the failure to have licensed personnel was a condition of unseaworthiness sufficient to bring the exclusion into play the Court has been cognizant, as was the Court in *Texaco, Inc. v. Universal Marine, Inc., supra*, that the concept of unseaworthiness is different vis-a-vis insurer and insured from the war-

ranty owed by the vessel owner to cargo or crew. With respect to cargo and crew the shipowner has a non-delegable duty to provide a seaworthy vessel regardless of knowledge or intent. The shipowner's duty with respect to his hull insurer is that he must not from bad faith or neglect allow his vessel to sail in an unseaworthy condition. As previously noted, the facts herein compel the conclusion that Mr. Bordlee's neglect rendered the MR. PETE unseaworthy within the meaning of the policy exclusion.

■ Finally, the exclusion requires that the unseaworthy condition be the proximate cause of loss. In connection with marine insurance a proximate cause is a "predominant or determining" or "real efficient" cause determination of which is, ". . . a matter of applying common sense and reasonable judgment as to the source of the losses alleged." *Blaine Richards & Company v. Marine Indemnity Insurance Company of America*, 635 F.2d 1051, 1054–55 (2nd Cir. 1980).

In this case we have held that Mr. Newell's navigation of the MR. PETE on the night in question was a cause contributing to collision and in the absence of which it might not have occurred. We further have found that his failure to possess a license has not been proven to lack any causal connection to his handling of his vessel.

In summary we hold that Mr. Bordlee, as representative of the assured, did not exercise due diligence to maintain the MR. PETE in a seaworthy condition after the attachment of the hull policy and that the unseaworthy condition so created was a proximate cause of the collision of December 19, 1979 involving the insured vessel. The hull policy does not provide coverage.[2] (INA and Allstate also provided P & I coverage to Bordlee by virtue of their policy AMW–1274. The insurers have not declined coverage under this policy and ac-

cordingly any coverage afforded by that policy is in full force and effect.)

■ Southern American Insurance Company provided excess coverage over the hull and P & I policies issued by INA and Allstate by virtue of its policy GM–502573. That policy provides that a breach of the insured's obligation to keep primary policies in full force and effect voids the excess policy. In this case there was no breach by Bordlee of the obligation to keep the primary hull and P & I policies in effect. We have held that both were in effect on the date of the casualty even though the accident is excluded from coverage under the hull policy. Under the circumstances the excess policy in this case was not rendered null and void and affords whatever coverage is otherwise applicable to the casualty.

Finally, Bordlee takes the position that by virtue of the conduct of INA and Allstate in participating in the Coast Guard investigation of the PINA–MR. PETE collision and in paying the previous hull insurance claim, they are estopped from denying coverage in this case. Again, we cannot agree with Bordlee's position.

■ In the field of marine insurance state law applies in the absence of federal legislation or a conflicting rule of law judicially established by the federal courts. *Wilburn Boat Company v. Fireman's Fund Insurance Company*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Walter v. Marine Office of America*, 537 F.2d 89, 94 (5th Cir. 1976); *Lemar Towing v. Fireman's Fund Insurance Co., supra*, 352 F.Supp. at 660.

■ According to LRS 22:651 investigating a loss or claim by the insurer is not deemed to constitute a waiver of any provision of a policy or of any defense thereunder.

---

**2.** We reject Bordlee's contention that the "Collision and Tower's Liability" coverage of the hull policy is unaffected by the breach of the unseaworthiness exclusion. The exclusion follows the provision for collision and tower's liability and states that breach of the exclusion

shall absolve the insurer from, ". . . any loss, damage or expense arising out of . . ." the breach. We further noted that Bordlee has presented us with no binding authority in support of its argument in this regard.

In this case the participation of INA and Allstate in the Coast Guard investigation began prior to the insurers having any knowledge of the facts upon which their denial of coverage was based. Upon learning these facts they proceeded without undue delay and advised the insured of their position approximately two weeks after their discovery of Mr. Bordlee's knowledge of the situation. Participation by INA and Allstate in the Coast Guard investigation did not serve to estop them from contesting coverage.

As we have found that the policy in question was not void, INA and Allstate should have paid the hull claim made prior to the PINA–MR. PETE collision and which was a covered claim under the policy.

Counsel shall submit an interlocutory decree in accordance with the foregoing opinion and approved as to form by all counsel.